UNITED STATES of America,
Appellee,

v.

Kenneth M. BRANDYBERRY, Appellant.

No. 25474.

United States Court of Appeals,
Ninth Circuit.

Feb. 11, 1971.

Jerome E. Stevenson (argued), Tustin, Cal., for appellant.

Gerald F. Uelmen (argued), Asst. U. S. Atty., Robert L. Meyer, U. S. Atty., Los Angeles, Cal., for appellee.

Before BARNES and HAMLEY, Circuit Judges, and LEVIN, District Judge.*

BARNES, Circuit Judge.

This is an appeal from a conviction of four counts of perjury (a fifth count was dismissed). The perjurious testimony charged was allegedly given before a grand jury investigating the "fixing" of a horse race.

Appellant had received a "tip" on "Deerwood Duke," a horse running in the twelfth race at Pomona, California, on September 25, 1968 (post time, 6:34 p. m.). Appellant stated he had received the tip from a person named Lyle, but denied the person was Lyle Berge (Count One). Appellant admitted he had placed a $900 bet on the horse named, but denied anyone else had shared in the proceeds of the bet (Count Two). The appellant denied he had ever heard of the name Irwin Hanft; denied he had ever met a man named Irwin Stone; and denied he had gone with one Talbert to Denny's Restaurant at La-Cienega and Wilshire, Los Angeles, to

---

* Honorable Gerald S. Levin, United States District Judge, Northern District of California, San Francisco, California, sitting by designation. After the hearing of this case, Judge Levin became seriously ill, and has been unable to consider or act on this opinion.

meet with Irwin Stone or Happy Meltzer (Count Three). The appellant admitted he had gone with one Talbert to Frascati's Restaurant, but denied he had seen or identified one Happy Maltzer (Meltzer) while there (Count Four).

Appellant was sentenced to two years on Counts One and Three, concurrently, and sentence on Counts Two and Four was suspended, and defendant placed on probation for two years, to commence after termination of the sentence on Counts One and Three.

Jurisdiction below rests on 18 U.S.C., §§ 1621 and 3231; and on appeal on 28 U.S.C., §§ 1291 and 1294.

■■ We start with the legal premise that it has long been the law that perjury "must be shown by clear, convincing and direct evidence to a moral certainty and beyond a reasonable doubt that the defendant committed wilful and corrupt perjury." The burden of such proof is on the government. Probable or credible evidence is not enough. Brown v. United States, 245 F.2d 549, 556 (8th Cir. 1957); Vuckson v. United States, 354 F.2d 918, 920 (9th Cir. 1966). Normally, this means that, while unlike most criminal cases wherein the testimony of one witness entitled to belief is sufficient to convict, it is the "well nigh universal rule * * * in federal and state courts" that the falsity of testimony in a perjury case must be proved by the testimony of two witnesses, or the testimony of one witness, plus some other corroborative evidence. Hammer v. United States, 271 U.S. 620, 626–627, 46 S.Ct. 603, 70 L.Ed. 1118 (1926); Arena v. United States, 226 F. 2d 227 (9th Cir. 1955) cert. den. 350 U. S. 954, 76 S.Ct. 342, 100 L.Ed. 830 (1956).

■ In Vuckson v. United States, *supra*, we pointed out that while perjury cannot be proved if there be "but one oath against another" (United States v. Wood, 39 U.S. 430, 437, 10 L.Ed. 527),

nevertheless a case may be made out against a defendant sufficient to go to a jury by direct and positive evidence (usually written evidence), *and* "there need not be 'live' oral testimony." (354 F.2d p. 920) The testimony must be direct and positive—it must establish the fact without the necessity for any inference based on human experience. If the evidence requires such an inference it is circumstantial, and not "direct and positive."

Appellant asserts three grounds for reversal which can be reduced to two— *First:* the sufficiency of the evidence; and *Second:* the admission against the defendant of inadmissible hearsay testimony.

■ We consider the first ground as to each count.

*Count One:* The appellant's brief aids us little when it makes the flat statement that "the government offered no evidence whatsoever that Mr. Lyle Berge gave defendant the tip, or that any conversation took place between defendant and Lyle Berge on September 25, 1968," and says nothing more. The latter statement, if true, is not conclusive. The government points out that the defendant testified he knew a Lyle Berge; that defendant testified the "Lyle" who telephoned him at Southward's home on September 25, 1968, was not Lyle *Berge;* that the defendant did not know "this Lyle's" last name, nor his occupation, nor where he lived, nor who any of his associates were; that he had seen him eight or ten times on the golf course, and saw him the morning of September 25, 1968 on the golf course; that "this Lyle" told appellant he might later have a tip on a horse; that appellant gave "this Lyle" the phone number at Southward's home; that appellant received a call from "this Lyle" at Southward's home, telling him to bet on "Deerwood Duke."

However, the foregoing statements of Brandyberry do not prove the "other

Lyle" was Lyle Berge. But there was other *direct and positive* evidence that did.

The government first relies on phone company records. From these records we learn:

(1) Lyle K. Berge, who was connected with "race horses," had a phone service listed as 827–8242 from which a call was made to area 213–773–7867 at 5:41 p. m. and 5:47 p. m. on September ·25, 1968. (Ex. 6) There were also two phone calls from Mr. Berge's phone to *Reno* (at 4:03 p. m.; and 7:15 p. m.) on September 25, 1968; and two to Gardena (5:27 p. m. and 6:55 p. m.), three to Downey (5:50 p. m., 5:57 p. m. and 7:56 p. m.), and one to Alhambra (5:49 p. m.).

(2) Area 213–773–7867 was the phone listed to John Southward (Ex 7) on September 25, 1968.

(3) William O. Lawler, on September 25, 1968, had phone service listed as 323–2050. He lived at Apt. 14, 15223 Raymond Avenue, Gardena, California.

(4) James M. Hewitt on September 25, 1968, had phone service listed as 329–5595. He lived at Apt. 28, 15223 Raymond Avenue, Gardena, California (Ex. 5), the apartment immediately above Lawler's and to which apartment Lawler had a key on September 25, 1968. Between 5:29 p. m. and 6:28 p. m. on September 25, 1968, twenty-three phone calls were made from Hewitt's phone (Ex. 5).

(5) John Southward had two telephones listed on September 25, 1968: 773–7867 and 927–3997. On the latter phone on that day a call was made to 714–827–8242, the number listed *to* Lyle K. Berge. The former phone listed received a call on September 25, 1968 *from* Lyle K. Berge's phone.

(6) The government introduced into evidence the Daily Starting Sheet of the Los Alamitos Golf Club for September 25, 1968 (Ex. 9). On it, entries had been made in the regular course of business by one Art Casey, the golf starter at that club, who made all the entries on that day on that sheet. The sheet showed a golf foursome starting at 12:30 p. m. made up of two men plus "Berge" and "Swank." Casey testified he knew "Berge" as Lyle Berge and "Swank" as Joe Swank. He testified there were two messages left for golf players on September 25, 1968, and he had made two entries to show that fact —one under · Berge's name—"Kenny— 773–7867" under the A.M. space, and the other "Berge; 827–8242" under the space where the above-mentioned foursome was named. The second number was that of Lyle Berge's home phone; the first was one of John Southward's phone numbers. Casey testified Lyle Berge and Joe Swank often played together; and he knew no other person who played the course with any frequency whose first name was "Lyle."

Lawler, who was compelled to testify under an immunity grant, admitted he had made arrangements with Jack Swank to place wagers on the horse "Deerwood Duke" on that day, and that he arranged for Swank to use the telephone of a neighbor who resided directly above Lawler's apartment [R.T. 302– 304]. Telephone records admitted in evidence showed a total of 34 toll calls were placed from Lawler's apartment on September 25, 1968, ten of them in the one and one-half hours preceding post time of the race. (Ex. 4; R.T. 230). During the same one and one-half hour period, while Swank was in the upstairs apartment, a total of 25 toll calls were made from the upstairs apartment (Ex. 5; R.T. 230–31).

Among the calls placed from the upstairs apartment by Swank was one to Houston, Texas, to a telephone number listed to the Hotel Americana (Ex. 5; R.T. 231; Stip., R.T. 88). This call was placed at 5:38 p. m. The recipient of the call, one Lynn Marmor, testified he was called by Jack Swank, who told him a horse named "Deerwood Duke" was running that day at Pomona, "and it had a good chance to win" (R.T. 382, 384).

Two minutes after Swank placed this call to Texas, at 5:40 p. m., a call was placed from the same telephone to telephone number (714) 827–8242, listed to Lyle Berge (Ex. 5, R.T. 231). Berge's telephone records indicated that one minute after receipt of the call from Swank, at 5:41 p. m., a call was placed to telephone number (213) 773–7867, the telephone at the residence of Jack Southward (Ex. 6; R.T. 232), where the defendant admitted he was when he received the tip on "Deerwood Duke." A second call followed at 5:47 p. m.

The evidence further established that the calls from the Berge phone to the Southward phone coincided precisely with the time at which the defendant received the "tip." According to Jack Talbert, he had been notified early that morning, by Southward, to "stand by" for a tip on a "hot horse" later that day, and was again reminded to stand by early that afternoon [R.T. 258–59]. Between 5:30 and 5:45 p. m., he testified, he was again called by Southward, who told him that "Kenny" was with him, and was at that moment getting the horse's name on the other phone (R.T. 256–57). Talbert called his bookmaker, and placed the bet as soon as Southward relayed the name of the horse "Deerwood Duke" to him, then confirming to Southward that the bet was in (R.T. 266). Talbert's attorney, who was with him at the time the "tip" came from Southward, and even took a "piece" of the bet himself, confirmed that the Southward call came at approximately 5:45 p. m. (R.T. 401).

In addition to the foregoing written evidence there was other testimony introduced by the government. Three waitresses testified to the frequent use of the coffee shop by Lyle Berge and Joe Swank, and identified each.

The witness Talbert testified (from pages 255–273 and 311 to 380) of his close relationship to the defendant in the betting coup; and in the efforts to collect the bet, partly for Talbert himself, partly for appellant, partly for Southward, partly for John Cayer, and partly for Don Tucker.

The total bet was $3,000, "$1,000 across the board," split as follows:

| Win | Place | Show | Total | |
|---|---|---|---|---|
| $ 50 | $ 50 | $ 50 | $150 | for John Cayer |
| $ 50 | $ 50 | $ 50 | $150 | for Don Tucker |
| $600 | $300 | — | $900 | for John Southward |
| $300 | $600 | $900 | $1800 | for Jack Talbert |

These bets netted $24,700, but were not promptly paid. Talbert, Cayer, appellant, and Southward all took active parts in efforts to collect the bet from Irwin Hanft (or Irwin Stone), and Tex or Happy Meltzer.

Talbert called "Kenny or Jack" after their horse came in, to thank them for their tip, and Kenny hung around Talbert's office "all the next day awaiting Irwin Stone's settlement call" that never came. Southward mentioned in appellant's presence that he (appellant) had part of the bet phoned from Southward's apartment on September 25, 1968.

This written evidence and oral testimony clearly establishes, by "more than the oath of one person" that appellant committed perjury when he said some person, first name Lyle, but not Lyle K. Berge, phoned him the tip on "Deerwood Duke." Moreover, the false statement to the grand jury (Ex. 2) seems to have been committed solely to protect Lyle Berge (and perhaps others), and thus the denial that it was Lyle Berge's call was wilful.

We affirm the conviction as to Count One.

*Count Two:* Count Two was based on the alleged false answer that "neither Mr. Southward nor anyone else had part of appellant's $900 bet."

Talbert testified that appellant, after the bet, both at Talbert's place of business (R.T. 273) and at Frascati's Restaurant (R.T. 323–34) said others had part of his bet. Cayer testified that the appellant had so stated (R.T. 402) perhaps twice, but at least once (R.T. 413). Thus there was sufficient evidence to take the issue to the jury, particularly in view of the appellant's indecisive an-

swers appearing in Exhibit 2, p. 200 (that he "could have" told Talbert the bet was for someone else). His explanation of why he said what he did could have been accepted by the jury, but apparently was not.

We affirm as to Count Two.

*Count Three:* Count Three was based on appellant's denial he had ever heard the name of Irvin (or Irwin) Hanft, or Irwin Stone, and did not go to Denny's Restaurant to meet with Stone. This denial is contradicted by the testimony of Talbert (R.T. 270–272, 312–14) and Cayer (R.T. 407).

We affirm the jury verdict convicting on Count Three.

*Count Four:* Count Four related to appellant's denial he "had gone to Frascati's Restaurant, had seen Talbert talk to someone, and had not heard that person's name." Again, two witnesses (Talbert and Cayer) testified appellant was present with them at Frascati's; that Talbert talked to "Tex" or Happy Meltzer, the bookmaker; that Talbert, Cayer, Southward and appellant "talked over" their meeting with Meltzer (using that name) driving home in one automobile. Again, a jury issue was raised, and decided adversely to appellant.

We affirm the conviction on Count Four.

The foregoing explanation of the sufficiency of the evidence on each count to take the case to the jury demonstrates there was no error in denying appellant's motion for judgment of acquittal made at the conclusion of the government's case.

We find no merit in alleged error relating to the admission of hearsay testimony. By defendant's own testimony, he and Southward were engaged in a common scheme or plan in placing their bet through Talbert; and conceivably Talbert was engaged in the same common scheme. United States v. Olweiss, 138 F.2d 798, 800 (2nd Cir. 1943).

The judgment of conviction is affirmed on all counts.