**UNITED STATES of America,**
**Plaintiff and Appellee,**

v.

**Ollie Vetta ANTHONY, Defendant**
**and Appellant.**

**UNITED STATES of America,**
**Plaintiff and Appellee,**

v.

**Cumire ANTHONY, Defendant and**
**Appellant.**

**Nos. 26150, 26151.**

United States Court of Appeals,
Ninth Circuit.

June 22, 1971.

Carmine J. Bua, of Politis & Bua, San Diego, Cal., for Ollie Vetta Anthony.

Edward A. Infante, of Pederson & Flowers, San Diego, Cal., for Cumire Anthony.

Harry Steward, U. S. Atty., Robert H. Filsinger, Chief, Crim. Div., Phillip W. Johnson, Sp. Asst. U. S. Atty., San Diego, Cal., for plaintiff-appellee.

Before KOELSCH and CARTER, Circuit Judges, and BYRNE,* District Judge.

* Honorable William M. Bryne, United States District Judge, Los Angeles, California, sitting by designation.

BYRNE, District Judge:

By jury verdict appellants were found guilty of knowingly concealing and facilitating the transportation of marihuana (84 pounds) and heroin (1 ounce) which had been unlawfully brought into the United States in violation of 21 U.S.C. §§ 176a and 174, respectively. Finding against appellants on all issues raised, we affirm their convictions.

At noon, on November 18, 1969, Ruben Hurtado, driving a 1961 white Corvair entered the United States from Mexico at the San Ysidro, California, Port of Entry. Hurtado's automobile was placed under immediate surveillance by United States Customs Agents.[1] Approximately one-half mile from the San Ysidro Port, the white Corvair was joined by a brown Tempest which appeared to be occupied by only the driver. The Tempest led the following Corvair to Chula Vista where the two automobiles briefly parked and then drove to a restaurant. During the drive to the restaurant, the Tempest was observed to have two occupants one of whom was identified as Alphonso Jaurique. The occupants of the Tempest stayed in the restaurant for approximately ten to fifteen minutes and then returned to the car. Shortly thereafter, the two automobiles returned to Highway 5 and renewed their trek northward.

Upon arriving in San Diego, the driver of the Tempest engaged in activity, e. g., speaking to pedestrians and other drivers, which suggested to the agents that the vehicles were lost. Finally, the two automobiles drove to a self-service parking lot at Eleventh and B Streets. There, Jaurique lifted the hood of the Corvair and did "something in the motor area." Shortly thereafter, Jaurique joined Hurtado and they drove away in the Tempest. The next day, Jaurique returned to the lot and paid the day's parking fees for the Corvair.

On November 21, Jaurique again returned to the parking lot driving the brown Tempest. On this occasion, the Tempest was accompanied by a Cadillac driven by appellant, Cumire Anthony (hereinafter Cumire). Appellant Ollie Anthony (hereinafter Ollie) was seated as a passenger in the Cadillac.

Jaurique and Cumire proceeded to lift the Corvair's hood and examine "the motor area." After conducting this examination, the two men engaged in a brief conversation whereupon at its conclusion Jaurique exited the parking lot driving the Tempest. Subsequent to Jaurique's departure, Cumire attempted to start the Corvair. Because the Corvair would not start, Ollie attempted to push the Corvair while Cumire steered. This effort proved futile; Cumire then substituted Ollie as the Corvair's driver and proceeded to push the compact while driving the Cadillac. After rolling only a few feet, the two automobiles were blocked by Customs Agents, who identified themselves and then undertook a cursory search of the Corvair. After discovering marihuana concealed in the automobile's air vent, appellants were placed under arrest. Subsequent to the arrest, a more thorough search of the vehicle was instigated. At this time, additional marihuana as well as the one ounce of heroin were recovered.

As indicated in Footnote 1, the 1961 white Corvair was placed under constant surveillance upon its entry into the United States as a result of a conversation between Customs Agent Aros and Ruben Hurtado prior to the latter's crossing the International Border on November 18, 1969, in the said automobile. This fact, to which appellants have vaguely hinted at in their briefs, serves as the foundation for their assertion that an "informant was a participant in the offenses for which" they were tried and convicted. Invoking the familiar case Roviaro v. United States, 353 U.S.

---

1. The placing of the white Corvair under immediate surveillance upon its entry into the United States was attributable to information Customs Agent Randolph

Aros learned during a conversation he had with Hurtado prior to the latter's driving the said vehicle into the United States on November 18, 1969.

53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), appellants maintain the district court erred when it refused to grant their "Motion for Disclosure of the Informant's Identification" because "* * * identity went to the very core of [appellants'] proof of [their] innocence, * * * it was impossible to present an adequate defense without ascertaining that identity * * *"

█ We are not persuaded that the teaching of *Roviaro* is applicable to the instant controversy, nor are we of the belief that appellants' defense in chief was dealt a mortal blow by the lower court's refusal to grant the motion for the informant's identification.

Appellants argue that the evidence adduced at the trial "strongly infers" that Hurtado and Jaurique were informants who alerted federal authorities to the contraband secreted in the white Corvair. Accepting this strong inference for the sake of this appeal, we cannot say the conduct of these informants brings this case within the purview of *Roviaro*. Here, Hurtado merely drove the load car across the international border. Jaurique's actions consisted of escorting Hurtado to San Diego, paying the parking fees of the load car and briefly meeting with appellants. At no time did either informant assist or witness the crime for which appellants have been convicted, i. e., on November 21, 1969, facilitate the transportation of marihuana and heroin which had been unlawfully imported into the United States. This conduct is clearly distinguishable from the informant's actions in *Roviaro*. There, the informant was a participant in and a witness to the crime which the defendant was found guilty of committing. Also, he was the only witness who could have contradicted the testimony of a federal narcotics agent regarding a conversation between himself and the defendant. Under such circumstances, the court held that "the trial court committed prejudicial error in permitting the Government to withhold the identity of its undercover employee." See, Lopez-Hernandez v. United States,

394 F.2d 820, 821 (9th Cir. 1968). In the instant case, no such error was committed because the informants' conduct clearly establishes that knowledge of their identity would not have been of material benefit to appellants' defense. United States v. Gibbs, 435 F.2d 621 (9th Cir. 1970); Lannom v. United States, 381 F.2d 858 (9th Cir. 1967).

█ Appellants also contend that testimony relating to criminal activity which occurred prior and subsequent to their arrests was "irrelevant, immaterial and highly prejudicial." Our review of the record and relevant authorities satisfy us that appellants did not bear the onerous burdens embodied in their claim of reversible error.

In the course of his re-cross examination of Customs Agent Aros, Cumire's trial counsel elicited the fact that on September 7, 1969, Hurtado had driven a maroon Corvair vehicle across the border and parked it in a nearby lot. There, Jaurique "made an appearance a short time later." Upon the Government's redirect examination of Aros, it was revealed that early the following morning a "slightly built" Negro male entered the Corvair and commenced a conversation with Jaurique who was seated in an automobile parked next to the Corvair. The Negro male then alighted from the Corvair and left the parking lot. Aros learned from another agent that this man had entered a pickup truck which had been stopped on Highway 5.

The event of September 8, 1969, did not surface again until the cross examination of Customs Agent Holleran by Cumire's trial counsel adduced the fact that Holleran had seen Cumire on September 8, 1969. During his redirect examination of this witness, the Government counsel developed the full circumstances of the September 8 incident. Holleran identified Cumire, who gave the name of "Richard Lee Walton" as the driver of the pickup truck he had stopped on Highway 5 that morning. Agent Holleran did not believe the woman passenger in the pickup was Ollie. A

search of the maroon Corvair led to the discovery of 26 kilos of marihuana and 1 ounce of heroin. At the conclusion of the testimony relating to the events of September 7 and 8, 1969, the trial judge acted upon Ollie's *first* objection to this testimony by denying her motion for a mistrial.

Sergeant Robert Johnson of the Los Angeles Police Department testified that on February 9, 1970, he conducted a narcotics investigation near appellants' Los Angeles residence. Johnson observed Cumire meeting with a known narcotics addict. During the course of his surveillance, Johnson observed numerous people, including two known heroin users, coming in and out of appellants' residence. Later that evening Johnson and his partner, who had been freely admitted to appellants' residence after informing Cumire they were conducting a narcotics investigation, placed appellants under arrest inside their home. Pursuant to a search warrant, the search of appellants' home resulted in the discovery of quantities of marihuana and dangerous drugs, as well as 817 grams of heroin.

The Government's purpose in detailing pre and post arrest involvement with marihuana and dangerous drugs was to establish appellants' intent when they attempted to move the 1961 white Corvair from the San Diego parking lot on the evening of November 21, 1969. It is noteworthy that the very nature of this evidence demanded and received selective applicability. For example, the events of September 7 and 8 which came to the surface as a result of the cross-examination of two Customs Agents conducted by Cumire's trial counsel, dealt exclusively with Cumire's activities. The marked similarity between the events of early September and those of late November no doubt was of considerable value to the perspective the jury placed on Cumire's determined effort to move the white Corvair from the San Diego parking lot. Similarly, the presence of marihuana and dangerous drugs in the appellants' home was of probative value with regard to their intent as they at-tempted to extricate themselves and the white Corvair from the lot. Given the nature of the criminal activity and the narrow purpose for which it was used, we are satisfied that no impropriety was committed by way of its introduction into evidence. DeCarlo v. United States, 422 F.2d 237 (9th Cir. 1970); United States v. LeVison, 418 F.2d 624 (9th Cir. 1969); Craft v. United States, 403 F.2d 360 (9th Cir. 1968).

During the period Johnson was inside appellants' home waiting for his partner's return with a warrant to search the premises, he answered numerous telephone calls. These calls dealt with Cumire's ability to secure various quantities of heroin. Appellants maintain that Johnson's actions were violative of the Fourth Amendment. They also assert that introduction into evidence of these calls constituted reversible error because they are "irrelevant, immaterial and highly prejudicial."

In support of their assertion, appellants placed principal reliance on Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). There, the Supreme Court held that even in the absence of physical trespass, an electronic surveillance of a telephone conversation between a suspect and a third person constituted a search and seizure under the Fourth Amendment. The instant factual situation brings this case outside the scope of the holding of *Katz*. Here, the arresting officer did not listen in on a conversation between others; the officer was himself a party to it. Also, in this case, the information obtained from these conversations was not used to prove an offense related to the telephone calls, but was utilized for the collateral purpose of establishing appellants' intent when they attempted to move the white Corvair from the San Diego parking lot.

As part of its case-in-chief, the Government introduced telephone records, consisting of an original telephone bill for the period September 28, 1969, to October 27, 1969, found in Ollie's purse at the time of her November 21 arrest and copies of telephone bills for the An-

thonys' residence covering the period October 27, 1969, to January 27, 1970, which were produced by a business supervisor of Pacific Telephone Company. These records indicated that between September 28, 1969, and January 27, 1970, several long distance telephone calls to the Tijuana residence of one Jose Jimenez, a suspected heroin dealer, had been charged to appellants' residence. While appellants acknowledge "that these (records) were kept in the ordinary course of business by Pacific Telephone," they argue, in effect, that the Government did not lay an adequate foundation for their admission because no evidence was introduced which established that either one of them placed these calls. Appellants maintain that their position is clearly within the scope of Seeber v. United States, 329 F.2d 572, 574 (9th Cir. 1964), where it is stated:

> "If there had been no other proof on the subject, save the testimony of the operators, then the slips, without any collateral proof tending to link defendant with the calls, lacked authenticity and should not have been admitted."

█ We are satisfied that the Government adduced "collateral proof" which tended to link appellants with these telephone calls. The presence of illegal drugs in his home coupled with his activity in San Ysidro on the morning of September 8, 1969, surely assisted the jury in reaching the conclusion that Cumire either made the telephone calls or was fully aware that they had been placed. Similarly, Sergeant Johnson's description of appellants' home as "neat and orderly" raised the inference that Ollie could not have maintained such an appearance without knowing of the contraband's presence. This fact and the finding of one of the telephone bills in her purse, must have satisfied the jury that at the very least, Ollie knew of the Tijuana telephone calls. The nub of such evidence was to support the Government's theory that appellants' determined effort to move the white Corvair from the San Diego parking lot was motivated by an intention to transport marihuana and heroin known to have been illegally imported into this country. See, United States v. Brandyberry, 438 F.2d 226 (9th Cir. 1971).

As an adjunct to their objection regarding the admission of the telephone records, appellants contend introducing evidence concerning a suspected drug trafficker, constituted "guilt by association." Appellants' reliance on United States v. DeDominicis, 332 F.2d 207 (2d Cir. 1964) as authority which is supportive of their contention is misplaced. There, a witness testified that a Canadian drug supplier "Knew or referred to the appellant." The court held this testimony to be prejudicial error "in light of * * * the circumstances of this trial." These circumstances consisted of an indictment containing two thousand five hundred fifty-three counts being returned against seventeen defendants. Although appellant's case was severed his jury was furnished with separate copies of counts 3 and 1244–1271, in addition to a "work sheet" delineating the counts relating to him. The Second Circuit believed that as a result of being furnished with non-related counts, the jury "may have been left with the impression that he was an integral part of an enormous criminal operation." As a consequence, the Court held that in this case the prophylactic instruction regarding guilt by association could not sanitize a jury which was later exposed to another vial of prejudicial evidence.

The tainted nature of the trial in *DeDominicis* is hardly analogous to the facts of the instant case. Here, by way of telephone bills, there was a strong inference that appellants *did* know a foreign drug supplier. Given its evidentiary purpose (see above) this inference cannot be said to be prejudicial. More importantly, unlike in *DeDominicis*, there is substantial direct and circumstantial evidence that the appellants committed the crimes for which they have been found guilty.

Affirmed.