[No. 8242. En Banc. June 29, 1995.]
In the Matter of the Disciplinary Proceeding Against DENNIS O. McMULLEN, an Attorney at Law.

152

*Maria S. Regimbal,* for Bar Association.
*Kurt M. Bulmer,* for respondent.

MADSEN, J. — The bar initiated disciplinary proceedings against Dennis McMullen (McMullen) for three loan transactions with an elderly client, Muriel Brimblecombe (Brimblecombe). The hearing examiner recommended disbarment and a majority of the Disciplinary Board adopted his recommendation. However, three members dissented, arguing that suspension was the more appropriate sanction. We review the board's determination.

## FACTS

McMullen has been practicing law in Spokane, Washing-

ton, since being admitted to the state bar in 1978. He and his wife Cynthia operate a partnership. In 1981, at the age of 80, Brimblecombe first came to McMullen to have a will prepared. She had a second will prepared in 1984 in which she named McMullen as executor and bequeathed him $1,000. McMullen did not execute this last will, but did act as notary for the witnesses to the will. During the course of this representation, Brimblecombe explained that her adoptive father had set up a trust of which she was a lifetime beneficiary. Pursuant to the trust, she then received $200 each month. Brimblecombe told McMullen that she wanted to break the trust so that she would have access to more than $200 per month and that her previous lawyer, William Harrison (Harrison), had not been able to do so.

In 1985, McMullen contacted the trustee, Chemical Bank in New York, to secure release of the trust. Chemical Bank told McMullen that if the remainderpersons would sign off, the bank would consider releasing the funds to Brimblecombe. The trustee's attorney, Robert Driscoll (Driscoll) mentioned that at least one of Brimblecombe's children had voiced some concern and stated that "the Chemical Bank is most reluctant to terminate the trust and distribute the proceeds without some kind of arrangement in place prior to such distribution, which would assure reasonable financial protection for Mrs. Brimblecombe". Washington State Bar Association (Ass'n) Ex. K. Driscoll also mentioned the previous payment of the trust money to another trustee under assignment.[1]

In response, McMullen proposed that he would create an informal trust, placing the money in an account which required both his and Brimblecombe's signatures. As McMullen put it, "This protects her from my absconding with funds without her permission, and also protects her and

---

[1]While no names are mentioned here, this is presumably the earlier arrangement between Brimblecombe and Harrison. Under that arrangement, Harrison took assignment of the funds and distributed them to Brimblecombe and her creditors. Harrison did this because of problems Brimblecombe was having with her creditors and their payment.

her estate from wanton spending without my advice and consent." Ass'n Ex. L. Driscoll agreed to the suggestion and sent along a proposed receipt, release and refunding agreement for McMullen and Brimblecombe to execute and then send along to her six children for signatures.

Two of Brimblecombe's children, Dorothy and Michael, had reservations about signing the agreement. Dorothy feared that the trust money would just go through her mother's fingers since "her mother never had any money and as a result had never handled any substantial amount of money" and that there would be none left to care for her mother later. Disciplinary Hearing Transcript (DHT), at 237. Dorothy told McMullen this. After discussing the potential problems amongst themselves, Brimblecombe's children decided that their mother was getting older, had never done anything, and that if she went through the money she would have had "a really good time". DHT, at 52. All the children signed thereafter. Dorothy said that she signed the agreement thinking that there would be some kind of control over the funds being released to Brimblecombe by McMullen.

The release agreement was executed in the fall of 1985 and disbursed an amount of $62,414.43. In part, the agreement says that the contingent remainderpersons have indicated that:

> they approve of their mother's having full use and benefit of said trust fund including the right to consume the principal thereof for any purpose whatsoever and, accordingly, have no objection to the termination of the trust and distribution to their mother of the entire trust fund at this time, free of any further limitations or restrictions. . . .

Ass'n Ex. E, at 3. The agreement further states, however, that the disbursement is approved because "the Trustee has been informed by Muriel E. Brimblecombe's counsel that arrangements have been made with Muriel E. Brimblecombe to provide her with reasonable financial safeguards with respect to any trust funds distributed to her". Ass'n Ex. E, at 3.

Before the trust was released, McMullen started soliciting information about investments for Brimblecombe and discussed these options with her. When the funds were received, they were put into a two-signature account as planned. Within five to seven weeks of Brimblecombe's receipt of the trust money, McMullen arranged for a loan of $30,000 from Brimblecombe to him and his wife. McMullen said that Brimblecombe initiated the loan idea and was adamant he accept.

On January 3, 1986, he drafted a promissory note in which he agreed to repay the $30,000 with interest of 12 percent per year by January 3, 1989. The monthly installments were for the interest only, an amount of $300. The note further provided that if any installments were not paid, the whole sum of the principal and interest would be immediately due and collectible at the option of the holder and that if a lawsuit were instituted to collect on the note, the McMullens would pay reasonable attorney fees. That same day the McMullens prepared an "Attorney's Disclosure and Client's Acknowledgment" document which they signed. This document said that the McMullens disclosed the fact that they wanted to borrow $30,000 on an unsecured basis from Brimblecombe, advised her to seek the advice of independent counsel, and gave her the opportunity to do so. It then said that the McMullens discussed the details of the transaction "including both the positive benefits (such as the rate of return) and the negative factors (such as the unsecured status of the loan)".[2] Ass'n Ex. B1. Brimblecombe signed an acknowledgment of these disclosures which also contained a statement that she wanted to proceed without any independent advice. McMullen testified that he consulted the Rules of

[2]Although not referenced in these documents or contained in Brimblecombe's file, McMullen testified that he and Brimblecombe discussed their past two tax returns, their income, a list of their personal and office bills, what was owed and what was delinquent, what were regular obligations and what were one-time obligations, the difference between secured and unsecured, and the fact that they were "not a particularly good financial risk". DHT, at 360; see also Resp't's Exs. 9-11. However, the hearing officer found that this information was not disclosed.

Professional Conduct (RPC) and believed that his disclosures would comply.

On August 3, 1986, McMullen took a second loan for which he prepared a second promissory note to Brimblecombe for $10,000 with interest of 12 percent per year. The language of this note was basically identical to the first. It was also due on January 3, 1989, and specified an interest only payment of $100 per month. A disclosure similar to the first was prepared and signed by both the McMullens and Brimblecombe on July 30, 1986. McMullen testified that Brimblecombe wanted to do this so she could get another $100 of income per month to cover what she was losing on the money market account and that he went through the same disclosures again. He said that he showed her their actual 1985 tax return and accounts payable and receivable and reminded her that she ought to diversify. Neither of these loans was secured.[3] McMullen stated that he had discussed the issue of security with Brimblecombe and that she wanted none.

On January 3, 1988, McMullen drafted a new promissory note to Brimblecombe which was to supersede the other two notes for an amount of $39,741. (Apparently the McMullens had paid some principal.) Yearly interest was only 9 percent. Monthly installments were to be made on the 15th of each month and included both interest and principal in the amount of $500. No payoff date was contained therein; however, McMullen testified that under straight amortization it would be paid off in about 10 years. The note further provided that the McMullens could charge legal fees against the outstanding principal balance but could not reduce the monthly payment and if any installments were not paid, the principal and interest was collectible at the option of the holder. Again, the note

---

[3] The $30,000 was secured for a brief period of time but only as an accommodation for McMullen to enable him "to complete the sale and the financing obligations" on the house he was selling. DHT, at 264. While filed at different times, Brimblecombe signed the mortgage and the satisfaction of that mortgage on the same day. This transaction was the subject of three counts of misconduct and a reprimand.

said that the McMullens would pay legal fees for any action to collect. On January 7, 1988, Brimblecombe signed the note acknowledging that it superseded the other two. Another disclosure form, similar to the others, was prepared. The McMullens signed on January 3. Brimblecombe signed her acknowledgment of the disclosures and the recommendation to seek counsel on January 7th. The disclosure described the loan as being restructured.[4] According to McMullen, this third note was executed because he realized he was not in a good position to refinance the loan and Brimblecombe had mentioned to him that while the $400 a month was nice, "she would love to have a little more than that". DHT, at 383-84.

McMullen was in a precarious financial situation when the loans were made. He had been absent from the firm while he ran for state senate in 1984 and the family had started feeling the financial crunch. McMullen estimated that his absence from the practice probably cost them $30,000. All of the McMullens' credit cards were within $500 of the maximum. The McMullens' home already had several mortgages on it. They had no other assets that were unencumbered.

In 1988, Brimblecombe suffered a stroke and was hospitalized. After she was discharged, she was feeble and was not able to return to her home on her own. Brimblecombe moved to a care facility in Portland where she died in September 1989.

After Brimblecombe's stroke in 1988, her son-in-law, Richard, discovered the loan to the McMullens. On August 11, 1988, Brimblecombe gave Richard a power of attorney. That same day, via letter, Richard requested that McMullen forward all records regarding Brimblecombe and also recommended that the McMullens pay off the loan in full including interest by September 15, 1988, because the

---

[4]McMullen testified that this loan was intended to be an annuity. There seems to be little support for this proposition. No mention was made in either the note or the disclosure that the renegotiated loan was intended to be an annuity. The disclosure only described the transaction as a restructuring and mentioned a benefit as being the "return of principal". Ass'n Ex. D1.

funds would be needed for Brimblecombe's care. McMullen responded that the only way to cash out the note would be to sell it.[5] Richard retained an attorney, Richard Agman (Agman).

Agman contacted McMullen and offered the "potential settlement" of securing the balance owed with a second deed of trust on their home and the titles to their vehicles and an increased monthly payment of $600 per month with the total amount due in nine months. Ass'n Ex. X. McMullen responded that he would be amenable to the second deed of trust, titles, and monthly amount of $600 because he had earlier proposed such a solution. However, he said he would be unable to pay off the loan in nine months, nor would he agree to pay title or attorney fees. Although no settlement was reached, the McMullens did thereafter make $600 payments. Richard said that no settlement was ever reached because McMullen would only secure the note if he received a discount in the amount due of $7,000. McMullen denied that assertion.

In September of 1988, Richard began receiving the note payments. He testified, however, that the McMullens missed payments close to the time they filed bankruptcy in 1991. Richard wrote a letter to McMullen which memorializes the fact that the August and September 1991 payments were past due.[6] In his letter, Richard also stated that, if the McMullens were to file bankruptcy, they should not list the note and implied that if they did he would have to notify the bar. Reaffirmation of the note had been discussed previously, but nothing definite had been decided. Richard eventually filed a grievance. Once Bar Counsel mentioned that it was in McMullen's best

---

[5]McMullen also advised Richard of Brimblecombe's will and the fact that McMullen was currently a beneficiary as well as the named executor and suggested that he might want to have Brimblecombe consider changing this. Later, Richard and his attorney wrote McMullen out of the new will they helped Brimblecombe prepare.

[6]At one point Richard testified that from April to May of 1990 the McMullens did not pay and then later paid the interest payment only. The clarity of his other testimony, as compared to this testimony, shows that he may have just been confused on the dates payments were missed.

interest to reaffirm the loan, communications seemed to improve: the McMullens said they were going to declare bankruptcy and offered to sign a reaffirmation agreement. The McMullens filed for bankruptcy on December 24, 1991.[7] A reaffirmation agreement was signed on March 17, 1992, and filed with the Bankruptcy Court on May 27, 1992. Since the bankruptcy was settled in July, Richard has received payments from the McMullens within five to six days of the due date.

A formal complaint was filed on July 31, 1992, charging McMullen with nine counts of misconduct. Counts 1 and 2 charged that entering into the $30,000 loan with Brimblecombe violated rule 1.1(c) and (i) of the Rules for Lawyer Discipline (RLD) and 1.1, 1.7(b), and 1.8(a) of the Rules of Professional Conduct (RPC). Counts 3 and 4 charged that entering into the $10,000 loan with Brimblecombe violated the same rules. Counts 5 and 6 charged misconduct violating the same rules when the loans were renegotiated.

Counts 7 through 9 charged misconduct regarding the use of a false mortgagor's affidavit violating RLD 1.1(c), (i), and RPC 8.4(c). Apparently, McMullen agreed to sell his house for $50,000 to the complainants, the Farnsworths, who wanted to apply for a loan based on the FHA appraisal of $55,000. McMullen agreed to assist them by filing an affidavit which falsely represented a purchase price of $55,000 and falsely indicated that approximately $5,000 would go to Brimblecombe under a dummy mortgage McMullen had prepared. McMullen explained the affidavit to the Farnsworths and advised them that it was not a true statement. The Farnsworths filed a grievance with the bar and a hearing was ordered on November 13, 1991. McMullen received no benefit from this transaction. However, the record shows that potential tax benefits might have been the motivation. On August 27, 1993, McMullen stipulated to discipline in the form of a reprimand for this conduct which the review committee approved.

---

[7]This bankruptcy was primarily the result of a malpractice action filed against McMullen in connection with his representation of another client unrelated to this action.

On September 14, 1993, a hearing was held on counts 1-6, with Thomas Heye presiding as the hearing examiner. Heye found that the trust funds were released to Brimblecombe only on the basis of assurances made by McMullen that he would insure that she properly handled these funds. He also found that Brimblecombe totally trusted and relied on McMullen and had no other funds to fall back on should she become sick, a very real possibility at her age. Heye said he did not believe that the McMullens had shown Brimblecombe documents regarding their perilous financial condition and, even if McMullen had shown her the financial information regarding their firm, it would have had little meaning to Brimblecombe because of her age and financial ignorance. He expressed concern that under the renegotiated loan, Brimblecombe would not have been repaid until she was 96 and also found that no mention was made whether the loan was dischargeable in bankruptcy.

Heye concluded that the first two loans violated RPC 1.8 because they were knowingly unfair and unreasonable and violated the oath to employ truth and honor in entrusted matters. To borrow "from an 84 year old woman with no financial sophistication whatsoever under the circumstances of this case was dishonorable of its very nature". Bar File doc. 14, at 15. Heye also found a violation of RPC 1.7, saying that McMullen's "own interests in this matter were in absolute unresolvable conflict with the interests of his client" and that "given the age, financial circumstances, and total investment inexperience of Muriel Brimblecombe, and the deplorable financial condition of the McMullens in January 1986, . . .the 'consent' signed by Muriel Brimblecombe was nothing more than a sham". Bar File doc. 14, at 16. Heye found that the renegotiated loan violated all the same rules for the same reasons. However, Heye found that RPC 1.1 was not violated in any of the loan transactions. Next, Heye found no mitigators and listed the following aggravators: prior disciplinary offenses (as represented by Counts 7-9), dishonest or selfish motive, a pattern of misconduct,

multiple offenses, refusal to acknowledge the wrongful nature of the conduct, and the vulnerability of the victim. Based on the above, Heye decided that McMullen should be disbarred and pay the costs of the disciplinary proceeding. If McMullen were to pay the full amount by October 31, 1993, he recommended only a 24-month suspension and readmission after passing the ethics section of the bar exam and paying the bar's costs.

The Disciplinary Board, with the exception of Delay, who recused,[8] then heard the case. The board added language to Heye's decision regarding the trust nature of McMullen's relationship with Brimblecombe and stated that while suspension was the presumptive sanction in this case, disbarment was justified because of the "numerous aggravating circumstances. . . and absence of mitigating circumstances". Bar File doc. 25, at 3. Seven members voted in favor of the adoption of the modified decision, three voted against, and one member was absent. The Disciplinary Board also recommended that McMullen pay the costs incurred by the Bar Association for the proceedings and that readmission be conditioned on repayment of the loan.

Two dissents were written to this decision. One dissent, in which another member joined, recommended instead that a suspension period of two years be imposed because: "Although Mr. McMullen did not 'steal' the money. . .we believe his conduct comes as close to stealing as can be achieved without satisfying the criminal elements for theft". Bar File doc. 29, at 1. The other dissent recommends only a six-month suspension.

McMullen sought review before this court pursuant to RLD 7.2.

## ANALYSIS

■ When evaluating an attorney discipline charge,

[8]Delay represented McMullen in connection with the earlier malpractice claim.

this court does not disturb a hearing examiner's findings of fact if supported by the clear preponderance of the evidence. *In re Curran*, 115 Wn.2d 747, 759, 801 P.2d 962 (1990); *In re Allotta*, 109 Wn.2d 787, 792, 748 P.2d 628 (1988); see also RLD 4.11(b). While the examiner's findings are not conclusive, they are nonetheless entitled to considerable weight, particularly when the credibility and veracity of witnesses are at issue. *Allotta*, at 793-94. This court is not to substitute its evaluation of the credibility of the witnesses over that of the hearing examiner. *Allotta*, at 794. However, the conclusions of the Disciplinary Board regarding the proper sanction are accorded greater weight than those of the hearing examiner. *In re Johnson*, 118 Wn.2d 693, 703, 826 P.2d 186 (1992).

Yet the ultimate responsibility and authority for determining the nature of attorney discipline rests with this court. *Johnson*, at 703. This court will adopt the recommended sanction of the board unless it can articulate a specific reason to depart from the board's recommendation and is persuaded that the sanction is inappropriate by one or more of the following factors:

(1) The purposes of attorney discipline (sanction must protect the public and deter other attorneys from similar misconduct);

(2) The proportionality of the sanction to the misconduct (sanction must not depart significantly from sanctions imposed in similar cases);

(3) The effect of the sanction on the attorney (sanction must not be clearly excessive);

(4) The record developed by the hearing panel (sanction must be fairly supported by the record and must not be based upon considerations not supported by the record); and

(5) The extent of agreement among the members of the board (sanction supported by unanimous recommendation will not be rejected in the absence of clear reasons).

*Johnson*, at 703 (quoting *In re Hankin*, 116 Wn.2d 293, 296, 804 P.2d 30 (1991) (citing *In re Johnson*, 114 Wn.2d

737, 752, 790 P.2d 1227 (1990); *In re Noble*, 100 Wn.2d 88, 95-96, 667 P.2d 608 (1983))); *see also In re McLendon*, 120 Wn.2d 761, 769, 845 P.2d 1006 (1993). This court may reject a nonunanimous recommendation of the board more readily than a unanimous decision. *McLendon*, at 769.

■ A violation of the RPC or of a lawyer's oath or duties is grounds for attorney discipline. RLD 1.1(c), (i). When a violation is found, a two-stage process is required to determine the appropriate sanction. First, the presumptive sanction is sketched out by outlining the ethical duty violated, the lawyer's mental state, and the extent of the actual or potential harm caused by the misconduct and then referencing the American Bar Ass'n, *Standards for Imposing Lawyer Sanctions* (1986). *In re Gillingham*, 126 Wn.2d 454, 896 P2d 656 (1995); *Johnson*, 118 Wn.2d at 701; *Hankin*, at 305. Second, aggravating and mitigating factors which may alter the presumptive sanction are considered. *Johnson*, 118 Wn.2d at 701.

■ The purposes of lawyer discipline are also to be factored when deciding the appropriate sanction. *McLendon*, at 769; *Noble*, at 95. The purposes of lawyer discipline are to protect the public and the administration of justice from lawyers who either have not, will not, or are unlikely to properly discharge their professional duties to clients, the public, the legal system, and the legal profession as well as deter misconduct of other attorneys and preserve public confidence in the bar. *Standards for Imposing Lawyer Sanctions* std. 1.1, at 7; *see also McLendon*, at 774.

I

Presumptive Sanction

A

Potential Violations

RPC 1.1 requires a lawyer to provide his or her client with competent representation. Because McMullen's conduct in this instance does not implicate the issue of

competency, we agree with the hearing examiner that RPC 1.1 was not violated by McMullen. Rather, Mc-Mullen's conduct involves the conflict of interest issues addressed by RPC 1.7(b) and 1.8(a). While these provisions appear to address the same conduct, we will address them as two different violations because the parties do not raise this issue. RPC 1.7(b) generally prevents a lawyer from representing a client if that representation will be materially limited by the lawyer's own interests unless the lawyer reasonably believes the representation will not be affected and the client consents in writing. RPC 1.8 addresses particular instances in which conflicts of interest are inherent.

■ Specifically, RPC 1.8(a) prevents a lawyer from entering into a business transaction with a client unless:

> (1) The transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client;

> (2) The client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and

> (3) The client consents thereto.

To justify a transaction with a client, the attorney has the burden of showing: "(1) there was no undue influence; (2) he or she gave the client exactly the same information or advice as would have been given by a disinterested attorney; and (3) the client would have received no greater benefit had he or she dealt with a stranger". *In re Mc-Glothlen*, 99 Wn.2d 515, 525, 663 P.2d 1330 (1983). Although *McGlothlen* was decided under the former Code of Professional Responsibility, this rule applies equally under the RPC.

While McMullen complied with some of the general requirements of RPC 1.7(b) and 1.8(a)—he disclosed the terms of the transactions in writing, advised his client to seek independent counsel, and received her written consent—it is clear that McMullen did not comply with

RPC 1.7(b)'s requirement that the lawyer reasonably believe that the representation will not be affected. On first glance, the interest rates on the first two loans appear close to market rates.[9] However, those rates were only available for secured loans. Since the loans to McMullen were unsecured, the interest rate here was arguably unreasonable. More importantly, as her investment counselor, McMullen should have sought secured investments.

While McMullen argues that the third transaction was intended to be an annuity and the rate given was reasonable for that type of investment, the terms of the promissory note and the disclosure form described the transaction as a restructuring of the loans and make no mention of an annuity or any other type of investment. As another loan, there is no justifiable reason for decreasing the interest rate to 9 percent per year from 12 percent when another year still existed on the original note. While McMullen argues that Brimblecombe wanted bigger payments, she should have gotten the full amount under the original note within a year. In short, we cannot find that McMullen reasonably believed that his representation was unaffected by his own interests. He received both a lower interest rate and an extended payment period on the renegotiated loan. Because his client was an 87-year-old investor, advising her to put her money into an unsecured, 10-year loan (which made no mention of its dischargeability in bankruptcy) with him where she would be unlikely to retrieve it should she need it for her care reeks of self-interest.

Nor did McMullen comply with the requirements of RPC 1.7(b) and 1.8(a) that the material facts be *fully* disclosed. Both the fact that the McMullens were not a good credit risk and the McMullens' financial status were material to

---

[9]The prime rate was 9.5 percent on January 3, 1986, and 8 percent on August 1, 1986. The prime rate is the price at which banks generally loan money to the customers a bank knows have good financial backing and ability to pay. Usually this rate is for secured loans.

the transaction and should have been disclosed.[10] Further, we believe that McMullen should have disclosed whether the notes were dischargeable in bankruptcy. This result is more in keeping with the purposes of the rules.

■ Next, we consider whether the transaction and its terms were fair and reasonable as required by RPC 1.8(a). Given Brimblecombe's financial acumen, age, and the trust relationship McMullen had with her as a client, we agree that it was not. Substantial evidence was presented at the disciplinary hearing regarding Brimblecombe's financial sophistication. The evidence on balance shows that Brimblecombe did indeed lack financial sophistication. She had never had this kind of money to invest and thus was inexperienced at differentiating between a good and a bad investment. Her family and former attorney persuasively pointed out that Brimblecombe was not a good money manager and had trouble paying her debts all her life. She frequently needed financial help from her family.

The McMullens argue that Brimblecombe was a bright, strongly opinionated woman who knew what she was doing. Yet even the McMullens' own testimony highlights Brimblecombe's lack of financial experience and history of problems. While it is not clear whether McMullen knew that Brimblecombe's previous lawyer, Harrison, had been assigned the trust funds for the purpose of straightening out creditor problems, he did have notice of her inability to handle her finances in the fall of 1987 when several of her checks from her personal checking account were rejected for insufficient funds. McMullen also knew that Brimblecombe's children were reluctant to agree to release the funds and were persuaded only by his suggestion of a

---

[10]Although McMullen claims to have disclosed these facts to Brimblecombe, all the documented financial information McMullen says he showed her was not in her file, but was reconstructed from what he remembered or found in other places (such as the firm's financial chart or the draft of his 1985 tax form). See DHT, at 361-82. Moreover, the written disclosure forms do not confirm that any of this information was presented or discussed. Only the McMullens testify that it was. Because of this, we uphold the hearing officer's determination that this information was not shown.

joint account that would enable him to act as a restraint on her foolish spending.

However, the evidence does show that Brimblecombe did have some knowledge and understanding as to the nature of her financial arrangements with McMullen. She knew that she needed an investment that generated income but would tie her money up so she could not spend it wantonly. Nor did she offer this money to the McMullens as a gift. The fact that she often had no money does not clearly indicate a lack of financial acumen; she previously had a very limited income.

Given the inconclusive nature of the evidence regarding her ability to understand the transactions, this alone is not determinative of whether the transactions were fair and reasonable in this case. However, Brimblecombe's age and the trust relationship she had with McMullen are persuasive on this point. Despite McMullen's assertions to the contrary, it is clear that some trust relationship did exist between him and Brimblecombe. He had to sign every check from their joint account since the release of the trust funds was conditioned on this. McMullen was her investment counselor for the money and, therefore, had some fiduciary duty with regard to the money entrusted to his supervision, as slight as that may have been. Having undertaken this duty, he was required to insure that his client invested in options that met her needs and provided a good rate of return. Instead, he ignored the basic tenets of investment for the elderly. One investment counselor McMullen consulted regarding the trust funds advised him that Brimblecombe should diversify, putting 30 percent in short-term investments and 70 percent in long-term investments, and recommended long-term options that would not lock her in but could be sold if she chose. Another investment counselor testified at the hearing that security is one of the foremost considerations for elderly clients who have limited income. Yet McMullen put Brimblecombe's money in a risky, unsecured loan and locked her money up for the long term. This was neither fair nor reasonable.

An attorney-client transaction is prima facie fraudulent. *Johnson*, 118 Wn.2d at 704. McMullen has failed to show that these transactions were not fraudulent under the three factors outlined in *McGlothlen*. First, McMullen failed to show that no undue influence occurred. He acted in the role of investment counselor to use his position and their friendship to borrow 64 percent of the money released from the trust within a year of its release. Second, he did not give the same advice an uninterested attorney would have in these circumstances. He knew she was an elderly woman who would need the trust money for her care. He knew of investments with better rates of return that would have met both the security and accessibility concerns of an elderly investor. If he had been uninterested, he would have advised her to seek these other investments. For these same reasons, McMullen fails the third requirement. Had she dealt with a stranger, such as the investment counselor from whom McMullen sought advice, Brimblecombe clearly would have received a higher rate of return, and a secured investment, and been able to access the money if she needed it.

In sum, McMullen has not demonstrated compliance with the rules as required under *McGlothlen*. McMullen took loans from his client under questionable circumstances where he had even more influence than the average lawyer because he acted as investment counselor with regard to the trust funds. The circumstances of this case present a classic illustration of the what these rules were designed to prevent.

Lastly, the hearing examiner found that McMullen violated his oath to use means consistent with truth and honor. Because McMullen has failed to show that his transaction with Brimblecombe was other than fraudulent under *McGlothlen*, we agree his conduct was not consistent with truth and honor and constitutes a violation of his oath.

## B
### Mental State

■ Next, we must consider the board's assessment of McMullen's mental state. "The lawyer's mental state may be one of intent, knowledge, or negligence." *Standards for Imposing Lawyer Sanctions* std. 3.0 & commentary, at 25. A lawyer acts with intent when he or she has "the conscious objective or purpose to accomplish a particular result". *Standards for Imposing Lawyer Sanctions* Definitions, at 7. A lawyer violates the rules with knowledge when he or she has "the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result". *Standards for Imposing Lawyer Sanctions* Definitions, at 7. A lawyer acts in negligence when he or she fails "to heed a substantial risk that circumstances exist or that a result will follow" and that failure "is a deviation from the standard of care that a reasonable lawyer would exercise in the situation". Standards for Imposing Lawyer Sanctions Definitions, at 7; *see also Johnson*, 118 Wn.2d at 702.

Although he made no clear finding, the hearing examiner implied that the mental state involved was knowledge. The board likewise thought that McMullen acted knowingly and, as a result, found suspension was the presumptive sanction under Standard 4.1, amending the hearing examiner's decision to better reflect this. We agree that McMullen knew the financial risk these transactions involved for his client and that he knew of the kinds of investments he should have advised Brimblecombe to make. The board was correct in concluding that his conduct was knowing.

## C
### Extent of the Harm

The next consideration is the extent of the actual or potential harm caused by the misconduct. The hearing

examiner found that potential and actual harm existed. We agree. Furthermore, the potential and actual harm is "serious". *Johnson*, 118 Wn.2d at 702. Because of these loans, money was not available for Brimblecombe's care when she needed it. Payment is still not certain despite the fact that the McMullens have continued to pay pursuant to the agreement and Brimblecombe's children receive these payments. *See Johnson*, 118 Wn.2d at 702. Fortunately, Brimblecombe's children were able to take care of her and her bills have been resolved.

## D

### The Presumptive Sanction

 We now review the presumptive sanction for McMullen's misconduct based on the three factors discussed above. Under the ABA standards, "[s]uspension is generally appropriate when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client". *Standards for Imposing Lawyer Sanctions* std. 4.32, at 10. Suspension results in the removal of a lawyer from the practice of law for a specified minimum period of time and "[g]enerally,. . . should be for a period of time equal to or greater than six months" but no longer than three years. *Standards for Imposing Lawyer Sanctions* std. 2.3, at 8. Given the violation, the mental state, and the injury, the board is correct. Suspension is the presumptive sanction in instances such as this where knowledge of impropriety is the requisite mental state. *Johnson*, 118 Wn.2d at 703.

## II

### Aggravating and Mitigating Circumstances

Finally, we examine the appropriate aggravating and mitigating circumstances which may better define or alter the presumptive sanction. The hearing examiner listed, and the board adopted, six aggravating circumstances with no mitigating circumstances. The first, prior disciplinary

offenses, is justified since McMullen had stipulated to a reprimand for the false mortgagor's affidavit. Dishonest or selfish motive was also involved since McMullen did need this loan and it is unlikely that he could have borrowed given his precarious financial circumstances. However, the board's finding of a pattern of misconduct is debatable. Although there was a pattern with regard to this client, McMullen has engaged in no similar misconduct with any other client. The aggravator of multiple offenses is appropriate even though the same client was involved because each loan constituted a separate offense. Refusal to acknowledge the wrongful nature of the conduct is not a strong aggravator in this case. McMullen testified that he thought he had complied with the rule. Moreover, before the hearing examiner he acknowledged that he wished he had written down and maintained copies of all the disclosures that were made about his financial situation. However, he should have also acknowledged that the loans were not good investments for his client's needs. Lastly, the vulnerability of the victim is a justified aggravator in this case. McMullen was aware that Brimblecombe lacked financial sophistication. A trust relationship also existed between McMullen and Brimblecombe and McMullen knew that she relied on him for advice in financial matters concerning the funds.

We disagree with the conclusion of the hearing examiner and the board that no mitigating factors existed. Even bar counsel acknowledged that McMullen had cooperated fully with the investigation and the proceedings. In addition, McMullen has made an effort to provide restitution.

### Conclusion

Despite its determination that the presumptive sanction should be suspension, a divided board recommended disbarment. Balancing the aggravating and mitigating circumstances, we find that a one-year suspension is the more appropriate sanction in this case. We feel that

departure from the majority's recommendation is justified because of the second factor enumerated in *Johnson*, the proportionality of the sanction. Disbarment in this case would be inconsistent with the sanctions imposed in other similar cases. *Johnson* similarly involved an attorney in a risky financial position who took a loan from a client. Johnson was only suspended for 60 days, placed on probation for two years, and ordered to make restitution over a period of time. *Johnson*, 118 Wn.2d at 708-09. *Gillingham* involved similar circumstances as well. Gillingham took an unsecured loan from an elderly client with whom he had become close as well as wrote himself into her will for approximately $120,000, a direct violation of RPC 1.8(c) which forbids such conduct. Gillingham was suspended for 60 days. *Gillingham*, slip op. 2.

Although similar in character to the conduct in those cases, McMullen's actions are more serious. *Johnson* involved only one loan taken from a more sophisticated party and no prior attorney misconduct. In *Gillingham*, the single loan was timely repaid and the client changed her will to exclude Gillingham. By comparison we find that the seriousness of this case merits McMullen's suspension for a period of one year, followed by probation for the two years following, and order restitution before readmission. McMullen must also pay the bar for the costs it has incurred.

DURHAM, C.J., SMITH and JOHNSON, JJ., and UTTER, J. Pro Tem., concur.

DOLLIVER, J. (dissenting) — By an overwhelming margin, the Disciplinary Board voted to disbar Mr. McMullen, who has shown no remorse for his actions in this case. In every

regard, it was correct. I would affirm this action and disbar Mr. McMullen from the practice of law.

BRACHTENBACH, J. Pro Tem., concurs with DOLLIVER, J.