[No. 18942-1. En Banc.]

Argued November 17, 1998. Decided April 8, 1999.

*In the Matter of the Disciplinary Proceeding Against* JOHN C. HUDDLESTON, *an Attorney at Law.*

---

*Maria S. Regimbal*; and *Stoel Rives Boley Jones & Grey*, by *Kathryn M. Milam* and *Peter R. Jarvis*, for the Bar Association.

*Kurt M. Bulmer*, for Huddleston.

DURHAM, J. — Attorney John C. Huddleston appeals the unanimous recommendation of the Washington State Bar Association Disciplinary Board (Board) that he be disbarred for violating the Rules of Professional Conduct. Huddleston challenges not only the conclusions reached by the Board, but the findings of fact underlying these conclusions. We agree with Huddleston's argument that the record does not support the conclusion that he committed perjury. Nevertheless, in light of Huddleston's multiple violations of the Rules of Professional Conduct, we conclude that he should be disbarred.

## I

The alleged misconduct in this case arose out of a magazine subscription service owned and operated by Huddleston. Due to the inherently fact-specific inquiry involved in attorney discipline cases, we will discuss the facts underlying Huddleston's misconduct in detail.

John C. Huddleston was admitted to the Washington State Bar in 1989. In 1990 and 1991, Huddleston started two magazine telemarketing businesses, Northwest Subscription Service and Pinnacle Subscription Service. Huddleston operated these businesses while working first as an associate at a Seattle law firm, and later as a deputy prosecutor at the Snohomish County Prosecutor's office.[1]

In order to increase the number of subscriptions and renewals obtained by his magazine telemarketing businesses, John Huddleston made false representations to induce magazine publishers to give him copies of their subscriber lists. Huddleston was aware that magazine publishers take extensive measures to protect their subscriber lists, but he sought to obtain the lists by pretending to rent

---

[1]Huddleston's operation of the subscription services ultimately led the prosecutor's office to ask for Huddleston's resignation due to his misuse of county property and resources to further his private business interests in magazine telemarketing.

the list for marketing purposes.[2] He prepared a sample oak paper towel rack and a flyer advertising it, and told magazine publishers that Pacific Artisans, a nonexistent company, wished to rent subscriber lists to market the paper towel rack. He sent the publishers and list-brokers copies of the flyer, and provided false projected mailing dates for the flyers. Huddleston admits that he intended to trick magazine publishers into believing that he would market the paper towel rack to their subscribers, when in fact he had no specific intention of marketing the product at any time. Instead, Huddleston wanted to use the lists to solicit renewals from current subscribers.

Huddleston and his agents also misled magazine subscribers. After obtaining subscriber lists, Huddleston had the names "matched" with phone numbers. Telemarketers at Northwest Subscription Service and Pinnacle Subscription Service then called the subscribers to solicit renewals, using a standard "pitch" for each solicitation. The "pitch" informed subscribers that the telemarketer was calling from a subscription service to check on the service of a particular magazine. Telemarketers told the subscriber that subscription prices would be going up due to a recent increase in postal rates,[3] and offered the subscriber an extension of their subscription at their current rate. Language in the pitch falsely implied that the telemarketers had information about when the subscribers' subscriptions were expiring and the length of time that the subscribers had been receiving the magazine. Hundreds of consumers complained to the Seattle Better Business Bureau, attorneys general and postal inspectors across the

---

[2]Sometimes magazine subscriber lists can be rented for the purpose of one-time marketing of specific preapproved goods or services through the mail. To ensure quality control of the mailings sent to their subscribers, publishers usually require a sample mailing piece to be preapproved, and may require the marketers to provide a projected mailing date. Rented lists are clearly marked with a label indicating that the list is for "one-time use only" and that unlawful use "will result in legal action." Clerk's Papers at 145. Persons who rent these lists are instructed to erase the data after the use.

[3]In fact, however, neither Huddleston nor his agents had any knowledge of future postal rate increases, nor of any proposed increase in subscription rates.

country about being misled by telemarketers from Huddleston's subscription services. Consumers complained that they were misled to believe that they were dealing directly with magazine publishers, and also complained about receiving unwanted subscriptions and not receiving paid-for subscriptions.

In response to these complaints, magazine publishers, including McGraw-Hill, contacted Huddleston to inform him that he was not authorized to solicit renewals from their current subscribers. When contacted by publishers, Huddleston lied about the source of his subscriber lists. Huddleston also refused to comply with publishers' demands that he stop soliciting their current subscribers, and continued to solicit subscriptions, sometimes using the same subscription service under a different name. On numerous occasions, Huddleston lied to magazine publishers in order to cover up the fact that he had surreptitiously obtained their subscriber lists using his paper towel rack scheme.

Huddleston made hundreds of thousands of dollars from his magazine telemarketing businesses, and admits that he made this money at the expense of magazine publishers. The subscription services sent invoices to the subscribers who they had contacted by phone, and the subscribers would then send their renewal checks directly to the services. As was standard practice, the subscription services retained 75 to 85 percent of this money, and remitted only the remaining portion to the magazine clearinghouses. McGraw-Hill lost over $88,000 in BUSINESS WEEK renewals alone to Huddleston.

Huddleston's refusal to comply with McGraw-Hill's demands that he stop soliciting subscriptions from their current subscribers caused McGraw-Hill to initiate a lawsuit against him. McGraw-Hill sought to permanently enjoin Huddleston from soliciting their subscribers and to obtain damages for his conduct. Shortly before the litigation was to begin, Huddleston filed various bankruptcy petitions, attempting to delay the litigation and to dis-

charge his debt to the magazine publisher. The bankruptcy proceeding resulted in a nondischargeable judgment for McGraw-Hill against Huddleston in the amount of $825,000. The court specifically found that Huddleston "made or authorized the making of false representations; that he knew the representations were false at the time made; that the representations were made with intent to deceive; and that [McGraw-Hill] justifiably relied on such representations and as a result [McGraw-Hill] suffered loss or damage." Clerk's Papers at 149.[4]

More than two years after the McGraw-Hill judgment, the Washington State Bar Association (WSBA) began disciplinary action against Huddleston. The formal complaint filed by WSBA charged Huddleston with five counts of alleged misconduct arising out of his magazine subscription marketing scheme and his conduct during the McGraw-Hill litigation. WSBA alleged that Huddleston obtained subscriber lists by means of false and fraudulent representations to magazine publishers in violation of the Rules of Professional Conduct and pertinent criminal statutes. Likewise, WSBA asserted that Huddleston should be disciplined for his dealings with subscribers, and his attempt to prolong his business after being contacted by magazine publishers. Finally, WSBA argued that Huddleston's conduct during the course of the McGraw-Hill litigation violated the Rules of Professional Conduct as well as his attorney's oath.

After a formal hearing, the hearing examiner found that evidence supported WSBA's allegations that Huddleston engaged in misconduct that violated both criminal statutes and the Rules of Professional Conduct. Specifically, the hearing examiner concluded that Huddleston should be disciplined for his conduct in obtaining subscriber lists, dealing with subscribers, and his attempts to prolong his

---

[4]Shortly after the judgment was entered against him in the McGraw-Hill litigation, Huddleston incorporated his law practice and transferred assets to it to avoid paying the judgment. McGraw-Hill and Huddleston later entered into an agreement requiring Huddleston to pay McGraw-Hill $125,000 in five installments. Huddleston has now fully satisfied the McGraw-Hill judgment.

business after being contacted by magazine publishers. Further, Huddleston's conduct during his attempted defense of the McGraw-Hill litigation, including Huddleston's offering perjured testimony, violating the preliminary injunction, and improperly shifting assets to avoid paying the judgment, warranted discipline. The hearing examiner recommended that Huddleston be disbarred. The Board unanimously upheld this recommendation, along with the hearing examiner's findings of fact and conclusions of law.

## II

■ Huddleston assigns error to many of the facts found by the hearing examiner, arguing that WSBA failed to prove these facts by a clear preponderance of the evidence. This court will not disturb a hearing examiner's findings of fact if the findings are supported by a clear preponderance of the evidence. *In re Discipline of McMullen*, 127 Wn.2d 150, 162, 896 P.2d 1281 (1995). Such findings are "not conclusive, [but] they are nonetheless entitled to considerable weight, particularly when the credibility and veracity of witnesses are at issue." *Id.* In reviewing these findings, we look at the entire record. *In re Discipline of Denend*, 98 Wn.2d 699, 704, 657 P.2d 1379 (1983). However, "we ordinarily will not disturb the findings of fact made upon conflicting evidence." *In re Discipline of Miller*, 95 Wn.2d 453, 457, 625 P.2d 701 (1981).

After carefully examining the voluminous record in this case, we conclude that Huddleston's contentions are without merit. Abundant evidence supports the factual findings challenged by Huddleston. "[S]ubstantial, albeit disputed, testimony" is sufficient to support challenged findings of fact. *Denend*, 98 Wn.2d at 704. Accordingly, we uphold the hearing examiner's findings of fact.

## III

■ Huddleston also challenges several conclusions of law. This court will uphold the hearing examiner's conclu-

sions of law only if the conclusions are supported by the findings of fact. *In re Discipline of Felice*, 112 Wn.2d 520, 525, 772 P.2d 505 (1989). Substantial facts in the record support the majority of challenged conclusions here. Because many of Huddleston's arguments are completely without merit, we will discuss only two of his challenges in detail. We conclude that facts and evidence in the record support the conclusion that Huddleston violated his attorney's oath. However, we agree that facts in the record do not support the conclusion that Huddleston committed perjury. We therefore reject the conclusion that Huddleston committed perjury, but uphold the rest of the hearing examiner's conclusions.

## A. Attorney's Oath

■ The conclusion that Huddleston violated his attorney's oath is supported by substantial facts in the record. The oath requires attorneys to abide by the laws of Washington as well as the laws of the United States. Admission to Practice Rule 5(d)(1) (APR). Additionally, by taking the oath, attorneys pledge to abide by the Rules of Professional Conduct. APR 5(d)(3). Violating the attorney's oath subjects an attorney to discipline under Rules for Lawyer Discipline 1.1(c) (RLD). In this case, the hearing examiner concluded that Huddleston violated the Rules of Professional Conduct as well as several criminal statutes. By committing the crimes of theft and wire or mail fraud, Huddleston certainly violated his attorney's oath. We therefore sustain this conclusion.[5]

## B. Perjury

The conclusion that Huddleston committed perjury is

---

[5]The hearing examiner specifically referenced Huddleston's attempted defense of the McGraw-Hill litigation and the portion of the attorney's oath that requires attorneys to "employ for the purpose of maintaining the causes confided to [them] only those means consistent with truth and honor." APR 5(d)(5). Because we conclude that Huddleston violated his attorney's oath by failing to abide by the laws of the United States and Washington, we need not discuss whether Huddleston's conduct during the McGraw-Hill litigation constituted an additional violation of the attorney's oath.

not supported by the facts found in this case. The hearing examiner concluded that Huddleston gave false testimony in the McGraw-Hill litigation and thereby committed perjury in violation of 18 U.S.C. § 1621. Specifically, the examiner found that Huddleston gave false testimony about his intent to mislead magazine publishers, his intent to mislead magazine subscribers about future rate increases, and his lack of knowledge of the impropriety of his acts.

▇ Under 18 U.S.C. § 1621, a person is guilty of committing perjury if they voluntarily and intentionally give testimony that they know to be false under oath about material matters. 18 U.S.C. § 1621 (1994). The burden of proof for a perjury conviction is very high: in the criminal context, perjury " 'must be shown by clear, convincing, and direct evidence to a moral certainty and beyond a reasonable doubt.' " *United States v. Brandyberry*, 438 F. 2d 226, 227 (9th Cir. 1971) (quoting *Brown v. United States*, 245 F.2d 549, 556 (8th Cir. 1957)).[6] Given this standard, rules have developed regarding the form and kind of evidence required to prove perjury. For example, the testimony of one witness is insufficient to convict a person of perjury. Instead, the falsity of perjurous testimony must be shown by the testimony of two witnesses or one witness with other corroborative evidence. *Id.* "The testimony must be direct and positive—it must establish the fact without the necessity for any inference based on human experience." *Id.* The elements and form of proof required to prove perjury in other contexts should apply in attorney discipline cases.

▇ Given these requirements, WSBA failed to carry its burden of proving that Huddleston committed perjury. Findings of fact do not support the hearing examiner's conclusion that Huddleston committed perjury. As to the

---

[6]In the context of attorney discipline, acts of attorney misconduct must be proven by a clear preponderance of the evidence. RLD 4.11(b). The clear preponderance standard is applicable to misconduct amounting to a felony or misdemeanor, for which an attorney is subject to discipline even in the absence of a criminal conviction. RLD 1.1(a). Therefore, contrary to Huddleston's assertions, WSBA did not need to prove that he committed perjury beyond a reasonable doubt.

first two areas in which Huddleston allegedly gave perjured testimony—his intent to mislead magazine publishers and his intent to mislead subscribers—neither WSBA nor the hearing examiner point to any specific perjured testimony. A close review of the record in the McGraw-Hill litigation yields no testimony by Huddleston denying an intent to mislead magazine publishers. Similarly, there is no evidence that Huddleston ever denied an intention to mislead magazine subscribers. Without evidence of a false statement made under oath by Huddleston, we are unable to conclude that he committed perjury.

We turn next to the conclusion that Huddleston committed perjury by falsely asserting a lack of knowledge as to the impropriety of his conduct. Huddleston allegedly committed perjury by answering "I don't know" in response to questions about whether he thought there was anything wrong with tricking magazine publishers in order to get their subscriber lists. *See* 1 Dep. of John Huddleston, at 220-21, *McGraw-Hill, Inc. v. Huddleston*, No. C92-397 (W.D. Wash. 1992). WSBA argues that the falsity of this statement was proven by Huddleston's later testimony during the disciplinary proceeding that he did think that his actions were wrong.[7] 6 Dep. of Huddleston at 132-33.

■ Even assuming that Huddleston's later testimony was sufficient to establish the falsity of his testimony during the deposition in the McGraw-Hill litigation, the conclusion that he committed perjury cannot be sustained. Opinions and legal conclusions are not subject to perjury convictions. *United States v. Endo*, 635 F. 2d 321, 323 (4th Cir. 1980). For purposes of perjury, a false statement must relate to facts and must also be susceptible to proof as to its truth or falsity. *Id.* The questions posed by opposing counsel in the deposition asked for Huddleston's opinion

---

[7]For purposes of perjury, when the alleged falsity is in the belief or the memory of the defendant, the falsity may be proved by circumstantial evidence alone, and the evidence need not conform to the two witness rule. *Gebhard v. United States*, 422 F.2d 281, 287 (9th Cir. 1970).

about the propriety of his actions. 1 Dep. of Huddleston at 220-21 ("And you don't think there is anything wrong with doing that? . . . [Y]ou told us earlier you know the difference between right and wrong."). Huddleston's "I don't know" statement cannot form the basis for the conclusion that he committed perjury.[8] We therefore reject the hearing examiner's conclusion that Huddleston committed perjury.

## IV

We must now determine the appropriate sanction for Huddleston. We must decide whether the Board's recommendation that he be disbarred is sustainable in the absence of the conclusion that Huddleston committed perjury.

 While we accord great weight to the Board's recommendation, the ultimate responsibility and authority for determining the nature of attorney discipline rests with this court and not the Board. *In re Discipline of Noble,* 100 Wn.2d 88, 95, 667 P.2d 608 (1983). The AMERICAN BAR ASSOCIATION CENTER FOR PROFESSIONAL RESPONSIBILITY, STANDARDS FOR IMPOSING LAWYER SANCTIONS (1991) (ABA STANDARDS) govern attorney discipline cases in Washington. *In re Discipline of Johnson,* 118 Wn.2d 693, 701, 826 P.2d 186 (1992). Determining the appropriate sanction is a two-step process. *In re Discipline of Gillingham,* 126 Wn.2d 454, 461, 896 P.2d 656 (1995). First, the presumptive sanction is determined by considering the ethical duty violated, the lawyer's mental state, and the extent of actual or potential harm caused by the misconduct. Next, the court must consider aggravating or mitigating factors that may alter the

---

[8]Furthermore, WSBA failed to prove that Huddleston voluntarily and intentionally offered false testimony. Huddleston explained that he answered "I don't know" because he was unclear about whether the question involved wrong in the legal sense rather than wrong in the moral sense. 6 Dep. of Huddleston, at 133-34, *McGraw-Hill, Inc. v. Huddleston,* No. C92-397 (W.D. Wash. 1992). Further, Huddleston specifically denied that he intended to lie about anything.

presumptive sanction. *Id.* at 461-62 (quoting *Johnson,* 118 Wn.2d at 701).

## A. Presumptive Sanction

In order to determine the presumptive sanction for Huddleston's misconduct, we turn first to the question of his ethical violations. The hearing examiner concluded that Huddleston repeatedly violated RPC 8.4(a), (b) and (c) by knowingly making false representations in order to obtain subscriber lists, by misleading magazine subscribers, and by attempting to wrongfully prolong his business after magazine publishers complained. Title 8 of the Rules of Professional Conduct deals with maintaining the integrity of the profession. Specifically, RPC 8.4 provides, in part:

> It is professional misconduct for a lawyer to:
>
> **(a)** Violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;
>
> **(b)** Commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;
>
> **(c)** Engage in conduct involving dishonesty, fraud, deceit or misrepresentation[.]

RPC 8.4 (a), (b), (c).

In addition to their duties to their clients, lawyers owe an ethical duty to the legal system, to the legal profession, and to the general public. ABA STANDARDS at 5. Lawyers are expected "to exhibit the highest standards of honesty and integrity" and not to engage in dishonest, fraudulent or deceitful conduct. *Id. See also In re Discipline of McGough,* 115 Wn.2d 1, 11, 793 P.2d 430 (1990). By violating RPC 8.4, Huddleston neglected his ethical obligations to the legal profession and to the general public. We agree that Huddleston violated his ethical duties by engaging in dishonest and deceitful conduct involving

misrepresentations, by committing the crimes of theft and mail or wire fraud, and by violating the Rules of Professional Conduct.

As to Huddleston's mental state, we must determine whether Huddleston acted intentionally, knowingly or negligently in violating his ethical duties. ABA STANDARDS, at 5. Intent is the most culpable mental state, and involves acting "with the conscious objective or purpose to accomplish a particular result." *Id.* at 6. The hearing examiner concluded that Huddleston's conduct in obtaining subscriber lists from magazine publishers and in dealing with magazine subscribers violated Washington's theft statute, RCW 9A.56.020-040. Clerk's Papers at 153-54. "[I]ntent to deprive [another] of . . . property or services" is a necessary element of the crime of theft. RCW 9A.56-.020(a), (b), (c). When Huddleston acquired the subscriber lists from magazine publishers, and then contacted subscribers to solicit subscriptions, he acted intentionally.

Huddleston also acted knowingly. Acting with knowledge is defined as acting "with conscious awareness of the nature or attendant circumstances of his or her conduct but without the conscious objective or purpose to accomplish a particular result." ABA STANDARDS at 6. His attempt to wrongfully prolong his business after magazine publishers complained was a knowing violation of his ethical obligations. We therefore conclude that Huddleston violated his ethical obligations both knowingly and intentionally.

Our final inquiry to determine the appropriate presumptive sanction for Huddleston is the extent of actual or potential harm caused by his misconduct. The hearing examiner specifically found that Huddleston's "fraudulent and criminal schemes" caused injury "to the public including magazine publishers, magazine list brokers, magazine subscribers and the regulatory agencies, such as Attorneys General throughout the country and the Seattle Better Business Bureau." Clerk's Papers at 155. Further, the hearing examiner concluded that Huddleston's conduct in the

McGraw-Hill litigation caused injury to the legal system, and that his total conduct injured the legal profession. Clerk's Papers at 156 (Huddleston's conduct "injured the profession . . . and tarnished the reputation and credibility of all other attorneys practicing law in the State of Washington."). We find these conclusions to be supported by abundant evidence in the record, and therefore agree that Huddleston caused serious harm to the public, the legal system and the profession.

We conclude that disbarment is the presumptive sanction in light of the ethical duties violated by Huddleston, his state of mind, and the extensive injury to magazine publishers, subscribers, and the general public. According to the ABA STANDARDS, disbarment is appropriate when:

(a) a lawyer engages in serious criminal conduct a necessary element of which includes intentional interference with the administration of justice, false swearing, misrepresentation, fraud, extortion, misappropriation, or theft . . . or

(b) a lawyer engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice.

ABA STANDARDS § 5.1 at 36. We have previously held that crimes of dishonesty, such as theft, reflect directly on the attorney's fitness to practice law. *In re Discipline of Plumb*, 126 Wn.2d 334, 341, 892 P.2d 739 (1995). Even without committing perjury, Huddleston's misconduct in dealing with magazine subscribers and publishers warrants disbarment.

## B. Mitigating Factors

Given that disbarment is the appropriate presumptive sanction for Huddleston's misconduct, this court must next decide whether aggravating or mitigating factors justify altering the presumptive sanction. ABA STANDARDS at 6.

Huddleston contends that disbarment is too extreme, and argues that mitigating factors warrant a reduction in the presumptive sanction. The hearing examiner specifically considered the mitigating factors of inexperience in the practice of law and absence of a prior disciplinary record, but Huddleston argues that other mitigators should have been considered.

Huddleston asserts that the more than two-year delay between the alleged misconduct and the disciplinary proceedings initiated by WSBA is a mitigating factor that should have been considered by the hearing examiner. *See* ABA Standards § 9.32(i) at 50 (delay a mitigating factor to be considered in determining the appropriate sanction for attorney discipline). However, the hearing examiner specifically rejected this argument, concluding that because Huddleston was not prejudiced by the timing of the disciplinary hearing, any delay was not a mitigating factor. Huddleston does not challenge the finding that he was not prejudiced by, and in fact benefited from, any delay in the disciplinary proceedings. Accordingly, we agree that delay was not a mitigating factor in this case.

Huddleston also argues that the fact that no additional misconduct occurred during the delay should be considered as a mitigating factor. Br. of Resp't at 38. However, we have previously rejected the cessation of misconduct as a mitigating factor. "Ending misconduct does not erase . . . that misconduct which has already occurred." *In re Discipline of Dann*, 136 Wn.2d 67, 83-84, 960 P.2d 416 (1998). Furthermore, the hearing examiner rejected Huddleston's proposed finding that he had been rehabilitated. In light of Huddleston's continued failure to fully acknowledge the wrongful nature of his misconduct, and his continued attempts to rationalize and justify his conduct, we agree that "interim rehabilitation" is not a mitigating factor warranting reduction of the presumptive sanction in Huddleston's case. *See* ABA Standards § 9.32(j) at 50 (interim rehabilitation may be considered as a mitigating factor).

Huddleston also argues that the fact that his conduct was "completely outside the practice of law" mitigates against disbarment. Br. of Resp't at 39; Supplemental Br. of Resp't at 9-13. Although not listed as a mitigating factor in the ABA STANDARDS, he asserts that when attorney misconduct occurs outside the practice of law, imposing a lesser sanction serves the purposes of attorney discipline. Huddleston cites *In re Discipline of Curran*, 115 Wn.2d 747, 801 P.2d 962, 1 A.L.R.5TH 1183 (1990), a case in which an attorney convicted of vehicular homicide was suspended and not disbarred, for this proposition. According to Huddleston, Curran was not disbarred because his actions "were outside his role as an attorney." Supplemental Br. of Resp't at 9. Like Curran, Huddleston argues that his sanction should be a suspension.

As a threshold matter, Huddleston misinterprets *Curran*. In *Curran*, this court considered the question of whether an attorney who committed vehicular homicide violated his ethical obligations. *Curran*, 115 Wn.2d at 751. We concluded that "conduct reflecting adversely on a lawyer's fitness to practice law can only be found when there is some nexus between the lawyer's conduct and those characteristics relevant to law practice." *Curran*, 115 Wn.2d at 768. In the absence of this nexus, the conclusion that an attorney violated RPC 8.4(b) cannot be sustained. *Id.* In *Curran*, we held that an insufficient nexus existed between the crime of vehicular homicide and those characteristics relevant to the practice of law. *Id. Curran* did not address the question of whether the fact that misconduct occurs outside the practice of law should be considered as a relevant mitigating factor.

 It is clear that Washington attorneys can be sanctioned for misconduct occurring outside the practice of law. Attorneys in Washington are subject to the Rules of Professional Conduct at all times, regardless of whether they are acting as an attorney at the time of the alleged misconduct. The Rules of Lawyer Discipline specifically provide that a lawyer may be subjected to discipline for

[t]he commission of any act involving moral turpitude, dishonesty, or corruption, or any unjustified act of assault or other act which reflects disregard for the rule of law, *whether the same be committed in the course of his or her conduct as a lawyer, or otherwise* . . . .

RLD 1.1(a) (emphasis added). In the past, we have not hesitated to impose appropriate sanctions upon attorneys engaging in misconduct outside the practice of law, provided that such conduct reflected adversely upon that attorney's ability to practice law. *Curran*, 115 Wn.2d 747 (1990) (vehicular homicide); *Plumb*, 126 Wn.2d 334 (1995) (theft).

After reviewing the Rules of Professional Conduct, we conclude that the fact that attorney misconduct occurs outside the practice of law is not a relevant mitigating factor. Attorney misconduct occurring outside the practice of law is, realistically, subject to discipline only under RPC 8.4.[9] Under the language of RPC 8.4, however, only the following conduct potentially occurring outside the practice of law can be subject to discipline: criminal acts that reflect adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects; conduct involving dishonesty, fraud, deceit or misrepresentation; conduct prejudicial to the administration of justice; and conduct or statements implying an ability to improperly influence government agencies or officials. RPC 8.4(b), (c), (d), (e). This kind of misconduct is serious and reflects adversely on an attorney's fitness to practice law, even if the misconduct occurs outside the practice of law. By including such conduct within the Rules of Professional Conduct, alongside rules governing misconduct relating to the practice of law, we have demonstrated our concern for certain types of misconduct that may occur outside the practice of law. Nothing in the Rules of Professional Conduct or the ABA STANDARDS indicates an intent to treat such conduct less

---

[9]The other Rules of Professional Conduct deal specifically with client-lawyer relationship (Title 1), the lawyer as a counselor or advocate (Titles 2 and 3, respectively), transactions with persons other than clients (Title 4), law firms and associations (Title 5), public service (Title 6), and information about legal services (Title 7). *See generally* Rules of Professional Conduct.

seriously because it occurred outside the practice of law. Likewise, Huddleston cites no persuasive authority for his position. We are therefore unconvinced that lesser sanctions are appropriate when the alleged misconduct occurs outside the practice of law. The hearing examiner did not err in failing to consider the fact that Huddleston's misconduct occurred outside the practice of law.[10]

██ ██ We also reject the rest of Huddleston's arguments about the presence of other mitigating factors in this case. Contrary to Huddleston's assertions, cooperating with the disciplinary proceedings is not a mitigating factor, even though lack of cooperation may be an aggravating factor. *Curran*, 115 Wn.2d at 774. Likewise, the fact that Huddleston has fully satisfied the McGraw-Hill judgment cannot be considered as a mitigating factor. ABA STANDARDS § 9.4(a) at 51 (forced or compelled restitution should not be considered as a mitigating factor). No additional mitigating factors justify reducing the presumptive sanction in this case. Accordingly, the presumptive sanction, disbarment, is appropriate.

## Conclusion

In conclusion, we accept the facts found by the hearing examiner and adopted by the Board. We also affirm the hearing examiner's conclusions of law, with the exception of the conclusion that Huddleston committed perjury during the course of the McGraw-Hill litigation. Even without committing perjury, however, we conclude that Huddleston

---

[10]Furthermore, even if Huddleston were correct that the hearing examiner should have considered the fact that his misconduct occurred outside the practice of law as a mitigating factor, this mitigating factor would be outweighed by the numerous aggravating factors relevant to this case. The hearing examiner considered several aggravating factors, including: dishonest or selfish motive; pattern of misconduct; multiple offenses; refusal to fully acknowledge wrongful nature of conduct prior to, and throughout, the present proceeding; vulnerability of victims (magazine subscribers); and attempts to conceal wrongdoing. Huddleston does not challenge these findings, and these findings are supported by the record. Therefore, even if the fact that misconduct occurred outside the practice of law were a mitigating factor here, it would not justify reducing the presumptive sanction.

engaged in numerous acts of misconduct in violation of both federal and Washington statutes, as well as the Rules of Professional Conduct. After considering Huddleston's ethical violations in light of relevant mitigating factors, we hold that such misconduct warrants disbarment. Accordingly, we order Huddleston to be disbarred.

GUY, C.J., SMITH, JOHNSON, MADSEN, ALEXANDER, and TALMADGE, JJ., and DOLLIVER, J. Pro Tem., concur.