[No. 08652-4. En Banc.]
Argued May 7, 2002. Decided April 17, 2003.

*In the Matter of the Disciplinary Proceeding Against* DOUGLAS SCHAFER, *an Attorney at Law.*

*Douglas Schafer*, pro se.

*Shawn T. Newman* and *Donald H. Mullins*, for petitioner Schafer.

*Christine Gray*, for the Bar Association.

*Cheryl C. Mitchell*, amicus curiae.

BRIDGE, J. — "[We] cannot tolerate for a moment, neither can the profession, neither can the community, any disloyalty on the part of a lawyer to his client. In all things he must be true to that trust, or, failing it, he must leave the profession."[1]

---

[1] *United States v. Costen*, 38 F. 24, 24 (C.C.D. Colo. 1889).

## I

On August 12, 1992, William Hamilton contacted his attorney, Douglas Schafer, requesting assistance in forming a corporation to purchase a bowling alley from the estate of Charles Hoffman. Schafer and Hamilton met on August 17, 1992 to discuss the formation of the corporation. During either the August 12 or 17 conversation, Hamilton informed Schafer that Grant Anderson was the personal representative and attorney for the Hoffman estate and that Anderson had been " 'milking' " the estate for four years. Decision Papers (DP) at 25. Significantly, Hamilton informed Schafer that Anderson was about to become a judge and needed to close the sale of the bowling alley quickly before Anderson assumed the bench. Hamilton said that Anderson was giving Hamilton a good deal on the bowling alley and that Hamilton would repay Anderson " 'down the road.' " *Id.* Schafer replied that "he did not want to hear about it." *Id.* In January 1993, Anderson was sworn in as a judge of the Pierce County Superior Court.

In July 1995, nearly three years after Schafer formed the corporation for Hamilton, Schafer represented Donald Barovic in a case before Judge Anderson. Judge Anderson ruled that Schafer's petition was frivolous and without legal merit, and assessed $1,000 in attorney fees against Schafer's client. On the day of Judge Anderson's ruling, Schafer copied the court file for the Hoffman estate and initiated calls to the attorneys involved in that matter. Schafer then met with Hamilton on December 18, 1995, to discuss Hamilton's prior statements about Anderson. Hamilton warned Schafer to "stop 'looking for dirt' " on Judge Anderson. *Id.* at 26.

Over the next month and a half, Schafer researched public records and contacted individuals to discuss Anderson's handling of the Hoffman estate, and also conferred with the attorney who represented Anderson's wife in the Andersons' marriage dissolution. The ex-Mrs. Anderson's divorce attorney recommended that Schafer investigate Anderson's acquisition of a Cadillac. On investigation,

Schafer discovered facts leading him to believe that Hamilton either had been paying for Anderson's Cadillac or had given him the funds to purchase it.

Then, on February 1, 1996, Hamilton sent a letter to Schafer terminating their professional relationship, stressing in the letter that Schafer had " 'no authority to disclose any privileged information, relating to your prior representation of me.' " *Id.* at 28. Later that day Schafer met with Hamilton and his new attorney, Philip Sloan. Hamilton and Sloan both emphasized to Schafer that he should not disclose any of the confidences that Hamilton had shared with Schafer and threatened to pursue disciplinary action if Schafer failed to protect Hamilton's confidential information. The next day, Sloan faxed instructions to Schafer " 'not to disclose any communications re Grant Anderson to anyone. If you do—you will be in violation of RPC 1.6.' " *Id.* Meanwhile, Schafer filed a motion of prejudice and supporting statement in the *Barovic* case, requesting the case be assigned to a judge other than Anderson. The motion included a reference to his investigation of Anderson's conduct with the Hoffman estate but did not disclose any information from Hamilton at that time.

Over the next several months, Schafer became obsessed with Judge Anderson. He met with a series of legal and government organizations, and eventually the press, revealing his findings about Anderson and Hamilton's dealings. On February 6, 1996, Schafer met with the Pierce County prosecuting attorney to discuss Anderson's alleged improprieties. Two days later he contacted the Federal Bureau of Investigation (FBI). The following day, the prosecutor's office informed Schafer that it was beginning an investigation of Schafer's allegations. On February 13, 1996, Schafer met with an investigator for the Washington Commission on Judicial Conduct (CJC) and provided her with documents related to Anderson's alleged misconduct.

On February 16, 1996, Schafer created a document titled "Declaration Under Penalty of Perjury" (declaration), which

revealed contents from his conversations with Hamilton. The relevant section of the declaration states:

> On August 12, 1992, I was called by my client, William L. Hamilton, who I previously had advised in several matters including the formation in 1990 of Sound Banking Company (of which he was President/CEO, as he had been at Western Community Bank for about 25 years before its sale), and he requested that I form a new corporation for him immediately. He said that an attorney he knew, Grant Anderson, had been "milking" an estate for four years and was about to become a judge, so he needed to quickly sell the estate's business, Pacific Lanes, in order to close the estate before he took the bench. Hamilton said that he had agreed to buy the business. It was either in that phone conversation or when we met on August 17, 1992, that Hamilton commented that there was no time for an appraisal of the business, that Anderson was giving him a good deal, and that Hamilton would repay him "down the road" by paying him as corporate secretary or something like that. When I heard that comment, I told Hamilton, "I don't even want to hear about it!" I formed his corporation, Pacific Recreation Enterprises, Inc., and had no further involvement with him concerning the purchase of Pacific Lanes. My notes from those conversations and papers Hamilton gave me when we met reflect that the estate was that of Chuck Hoffman.

DP at 31.

Schafer also prepared a memorandum, dated February 29, 1996, addressed to "Appropriate Public Officials," (memorandum) which he provided with his declaration and select files and documents. DP at 32. Schafer sent his declaration and memorandum to the Washington attorney general's office on March 1, 1996. He then sent the declaration, memorandum and a box of documents to the Washington State Bar Association (WSBA). He sent the declaration and memorandum to the Internal Revenue Service (IRS), Criminal Investigation Division. He also appended the declaration containing Hamilton's confidences, the memorandum and select documents to a motion for discretionary review filed in the Court of Appeals in the *Barovic* case, but did not seek court assistance to protect the

confidentiality of the documents.[2] Upon filing, the content of Hamilton's conversations with Schafer became available to the public at large as a court record. Finally, on April 26, 1996, Schafer provided his declaration and memorandum to *The Seattle Times*, the *Seattle Post-Intelligencer*, and *The News Tribune*.

Outraged at Schafer's disclosures, Hamilton filed a grievance against Schafer with the WSBA on July 26, 1996, claiming Schafer violated the Rules of Professional Conduct (RPC) when he disclosed Hamilton's confidential information without authorization. Despite the pending grievance, Schafer went on to author two articles in local newspapers, touting his role in Anderson's disciplinary proceedings and exposing Hamilton's confidences in detail.[3] Hamilton filed a formal complaint on May 26, 1999 (ultimately amended by a hearing officer order), charging Schafer with violation of RPC 1.6, subjecting Schafer to potential sanction under the former Rules for Lawyer Discipline (RLD) 1.1(i) (1997).

Before the grievance against Schafer was heard, on July 29, 1999, this court issued a decision in *In re Disciplinary Proceeding Against Anderson*, 138 Wn.2d 830, 981 P.2d 426 (1999), in which we concurred in the findings of the CJC that Judge Anderson had violated Canon 1, Canon 2(A), Canon 5(C)(3), and Canon 6(C). We removed him from his judicial office. Then, by order dated May 4, 2000, we approved a stipulation of discipline, suspending Anderson from the practice of law for two years.

On August 18, 2000, a hearing officer concluded that Schafer had revealed confidences and/or secrets relating to his representation of Hamilton in violation of RPC 1.6(a). After applying the American Bar Association (ABA) standards for lawyer misconduct and considering aggravating and mitigating factors, the hearing officer recommended a

---

[2] *See* CR 26(c).

[3] Douglas A. Schafer, *Money Trails*, THE TACOMA VOICE, June 15-29, 1998, at 4 (Association's Ex. A-192); Douglas Schafer, *Judicial Conduct Commission Went Easy on Judge Grant L. Anderson*, THE UNIVERSITY PLACE JOURNAL, Apr. 30, 1998, at 12 (Association's Ex. A-193).

six-month suspension from the practice of law and, additionally, that Schafer pay the expenses associated with the proceedings.

Schafer appealed to the WSBA disciplinary board. The 10-member disciplinary board unanimously agreed with the hearing officer's conclusion that Schafer had violated RPC 1.6. But after considering mitigating and aggravating factors, seven of the board members suggested an increased sanction of a one-year suspension from the practice of law. Two of the board members disagreed with the increased sanction (preferring the hearing officer's recommendation); one board member supported reducing the sanction to a reprimand. Schafer assigned error to various findings of fact and conclusions of law, and brought the matter to this court.

## II

■■■■ In a bar discipline case, this court generally accepts as true any unchallenged findings of fact made by the hearing officer that are affirmed by the disciplinary board. *In re Disciplinary Proceeding Against Carmick*, 146 Wn.2d 582, 594, 48 P.3d 311 (2002). A hearing officer's findings of fact are entitled to considerable weight, although they are not conclusive. *Id*. A hearing officer's conclusions of law will be upheld if they are supported by the findings of fact. *Id*. at 595.

The issues before us can be summarized as follows:

(1) Did the hearing officer and the disciplinary board err when they concluded that Schafer violated RPC 1.6?

(2) If not, is there an applicable exception to RPC 1.6 which excused the violation?

(3) If not, what is the appropriate sanction?

■■■■ We hold that Schafer violated RPC 1.6 when he revealed his client's confidences and secrets, and that there is no exception to the rule which excuses the violation in these circumstances. In light of the importance of maintain-

ing a client's confidences and Schafer's willful, unnecessary, and repeated violation of his ethical duty not to betray his client's trust, we hold that a six-month suspension is appropriate.

(1) Did Schafer violate RPC 1.6?

RPC 1.6, as adopted in Washington, states:

(a) *A lawyer shall not reveal confidences or secrets relating to representation of a client* unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation, and except as stated in sections (b) and (c).

(Emphasis added.)

RPC 1.6 prohibits an attorney from disclosing client confidences and secrets. A "confidence" is defined by the RPC as "information protected by the attorney-client privilege under applicable law." RPC terminology. A "secret" refers to "other information gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client." *Id.* We conclude that Hamilton's statements to Schafer qualify as a "confidence" or "secret" under RPC 1.6.

Schafer had represented Hamilton in numerous previous transactions before Hamilton returned to Schafer for his services to create a corporation to purchase a bowling alley. When Hamilton hired Schafer to represent him in that transaction, an attorney-client relationship was established between the two parties again. Hamilton's return to Schafer for his assistance evidences Hamilton's trust in Schafer's professional abilities. Based on this trust, Hamilton freely shared information with Schafer as part of their attorney-client relationship and in the course of forming Pacific Recreation Enterprises, Inc., to purchase the Pacific Lanes bowling alley.

To uphold the valid purposes of RPC 1.6 of encouraging candor and facilitating trust between attorney and client,

Hamilton's statements to Schafer warranted protection. Schafer violated this trust by revealing Hamilton's confidences or secrets when he disclosed Hamilton's statements to the Pierce County prosecutor, FBI, CJC, Washington attorney general, WSBA, IRS, three newspapers, his unprotected court filing in the *Barovic* case, and by including the confidences in articles he had published in two local newspapers. When Hamilton realized that the information that he had shared with Schafer, in full candor under the auspices of the protected relationship, was in jeopardy, he repeatedly demanded that Schafer respect this confidential information. Schafer ignored these demands.

■ It is a "fundamental principle in the client-lawyer relationship . . . that the lawyer maintain confidentiality of information relating to the representation." ABA, MODEL RULES OF PROF'L CONDUCT R. 1.6 cmt. 4 (1991). Indeed, "lawyers are regarded as people who know how to keep secrets, as much as they are regarded as litigators . . . or drafters of contracts." 1 GEOFFREY C. HAZARD, JR. & W. WILLIAM HODES, THE LAW OF LAWYERING § 9.2 (3d ed. 2002). This perception is founded on more than 300 years of the practice of confidentiality.[4]

But the privilege does not exist merely for the benefit of individuals. The attorney-client privilege has been sustained for centuries because of the fundamental benefits that accrue to society at large. The privilege "promote[s] broader public interests in the observance of law and the administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S. Ct. 677, 66 L. Ed. 2d 584 (1981). The attorney-client privilege is pivotal in the orderly administration of the legal system, which is the cornerstone of a just society. The reasoning is tripartite: to maintain the adversarial system, parties must utilize lawyers to resolve disputes; lawyers must know all the relevant facts to

---

[4] The attorney-client privilege is thought to derive from the original concept of an attorney's implicit oath of loyalty to his client and is the oldest of the common law privileges. 8 JOHN HENRY WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW § 2290 (John T. McNaughton ed., 4th rev. ed. 1961).

advocate effectively; and clients will not confide in lawyers and provide them with the necessary information unless the client knows what he says will remain confidential.[5] The confidential relationship that exists between an attorney and client facilitates the full development of facts necessary for proper representation and encourages clients to seek legal assistance early.[6]

The privilege also benefits society by helping to prevent crime and other misconduct by encouraging clients to disclose contemplated wrongdoing, giving attorneys a chance to discourage such acts.[7] In this regard, it is unfortunate that Schafer did not take the opportunity to counsel Hamilton in 1992 on the possible legal implications of Hamilton's alleged statements.

The attorney-client privilege protects against unjust application of the law on a wide scale. In particular "[t]he attorney-client privilege benefits society by encouraging laymen to seek legal services and thereby learn their legal rights and responsibilities and obtain effective representation in litigation." *Development in the Law—Privileged Communications*, 98 HARV. L. REV. 1450, 1501 (1985). The privilege has long been considered instrumental in achieving social good because it induces clients to consult freely with lawyers and by doing so acquire expert legal advice and representation that helps them operate within the complex legal system. *Id.* at 1502. Because the privilege encourages clients to communicate fully with an attorney, lawyers are able to defend clients vigorously against charges and to assure them that the law will be applied justly. Without an effective attorney-client privilege, clients may be inhibited from revealing not only adverse facts but

---

[5] Carolyn C. Guttilla, *Caught Between a Rock and a Hard Place: When Can or Should an Attorney Disclose a Client's Confidence?*, 32 SUFFOLK U. L. REV. 707 (1999).

[6] ABA, MODEL RULES OF PROF'L CONDUCT R. 1.6 (1991).

[7] *See* Fred C. Zacharias, *Rethinking Confidentiality*, 74 IOWA L. REV. 351, 359 (1989).

also favorable information that the client might mistakenly believe is damaging.[8]

Erosion of this privilege through willful breaches of a client's trust by an attorney is undoubtedly harmful to society because these breaches weaken the public perception that people can seek assistance and rely on an attorney as an expert and counselor "free from the consequences or the apprehension of disclosure." *Hunt v. Blackburn*, 128 U.S. 464, 470, 9 S. Ct. 125, 32 L. Ed. 488 (1888). Impairing the attorney-client privilege must be avoided because "[t]he attorney-client privilege may well be the pivotal element of the modern American lawyer's professional functions. It is considered indispensable to the lawyer's function as an advocate . . . [and] confidential counselor in law." Geoffrey C. Hazard, Jr., *An Historical Perspective on the Attorney-Client Privilege*, 66 CAL. L. REV. 1061, 1061 (1978).

(2) Is there an applicable exception to RPC 1.6?

A. Exceptions in the RPC

(b) A lawyer may reveal such confidences or secrets to the extent the lawyer reasonably believes necessary:

(1) To prevent the client from committing a crime; or

(2) To establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client, to establish a defense to a criminal charge or civil claim against the lawyer based upon conduct in which the client was involved, to respond to allegations in any proceeding concerning the lawyer's representation of the client, or pursuant to court order.

(c) A lawyer may reveal to the tribunal confidences or secrets which disclose any breach of fiduciary responsibility by a client who is a guardian, personal representative, receiver, or other court appointed fiduciary.

RPC 1.6.

While we laud the principles protecting the sanctity of attorney-client confidences and secrets, we are cognizant that there are occasions when revealing a client's statements may be justified. These occasions are extremely

---

[8] Vincent C. Alexander, *The Corporate Attorney-Client Privilege: A Study of the Participants*, 63 ST. JOHN'S L. REV. 191, 213 (1989).

limited, however, consistent with the profession's goals of establishing and maintaining trust in the judicial process.

██ RPC 1.6(c) indicates that "[a] lawyer *may* reveal *to the tribunal* confidences or secrets which disclose any breach of fiduciary responsibility by a client who is a guardian, personal representative, receiver, or other court appointed fiduciary." (Emphasis added.) Schafer contends that he was justified in reporting *Hamilton's* confidential statements under RPC 1.6(c) because *Anderson* assumed a fiduciary role as the personal representative of the Hoffman estate. While Schafer may very well have been justified in reporting Anderson's alleged misconduct regarding the estate, he need not have reported his own client's confidences and secrets to accomplish this goal. There is very little doubt that sufficient additional alternative evidence existed in the public records to make revealing Hamilton's confidences unnecessary.

Schafer himself admitted at oral argument that perhaps there was no need to reveal his client's confidences in order to make the allegations against Anderson. Schafer told this court that evidence existed in "the deeds, the documents in the probate file, the records . . . obtained from the gambling commission, the information . . . obtained from cooperative title officers, [these were] all public records, all collectively in the public domain." *In re Disciplinary Proceeding Against Schafer*, No. 08652-4 (Oral Argument) (Wash. Supreme Ct. May 7, 2002). Schafer also disclosed in his newspaper article that his source for the "overwhelming evidence" of Anderson's misconduct was the public record. Douglas A. Schafer, *Money Trails*, THE TACOMA VOICE, June 15-29, 1998, at 4. Moreover, Schafer was not, nor has he ever contended that he was, attempting to reveal misconduct by his own client, Hamilton.

Furthermore, RPC 1.6(c) permits disclosure *"to the tribunal,"* not to newspapers and a sundry assortment of "appropriate public officials." DP at 32. (Emphasis added.) Schafer insisted at oral argument that the additional reporting to parties other than the appropriate tribunal was necessary

because he was not seeing results. However, Schafer, who waited three years from the time of first hearing of an alleged transgression on Anderson's part, apparently became frustrated only two and a half months after making the initial allegations and revealed his client's statements to the press. His impatience is not justification for breaching client confidences, particularly since the CJC had indicated that it took his allegations very seriously and the prosecutor's office had informed him days before he reported the allegations to the press that it was also investigating the matter. It is clear that Schafer disregarded the assurances from these organizations and the repeated requests from his own client to protect the information shared in confidence. Schafer also repeated his disclosure of Hamilton's confidences in the two newspaper articles he wrote in 1998, well after the investigation of Anderson had begun, making Schafer's assertions that his actions were to prompt a response from investigators totally unavailing. Accordingly, we agree with the disciplinary board's assessment:

> The Board unanimously supports Mr. Schafer's reporting of suspected judicial or lawyer misconduct. The hearing officer found that Mr. Schafer could have made these reports based on his investigations, without disclosing his client's statements. The record supports this finding. The Board does not support Mr. Schafer's disclosures of his client's secrets and confidences during his personal investigation, especially to the prosecutor's office, the FBI, the IRS and the press. It is not reasonable to believe that any of these disclosures were necessary to report suspected judicial or lawyer misconduct. Mr. Schafer took no steps to protect this information.

DP at 10.

None of Schafer's excuses for his breach of Hamilton's trust are persuasive. He contends that his actions were permissible under RPC 8.3 and RPC 3.3. They were not. RPC 8.3, concerning reporting professional misconduct, states:

(a) A lawyer having knowledge that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness or fitness as a lawyer in other respects, should promptly inform the appropriate professional authority.

(b) A lawyer having knowledge that a judge has committed a violation of applicable rules of judicial conduct that raises a substantial question as to the judge's fitness for office should promptly inform the appropriate authority.

(c) This rule does not require disclosure of information otherwise protected by rule 1.6.

RPC 8.3 creates a permissive, not mandatory, disclosure when confidences and secrets under RPC 1.6 are concerned. *See* RPC 8.3(c). But consistent with RPC 1.6, under RPC 8.3, disclosure of the alleged misconduct is limited to an "appropriate professional authority" only.

 Similarly, the rule pertaining to candor toward the tribunal, RPC 3.3(a)(2), states, "[a] lawyer shall not knowingly . . . [f]ail to disclose a material fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client unless such disclosure is prohibited by rule 1.6." Thus, RPC 3.3 also does not mandate disclosure when RPC 1.6 is implicated. The candor required under RPC 3.3 is *to the tribunal*. Therefore, Schafer could and should have appropriately reported Anderson's alleged indiscretions to the tribunal or the appropriate professional authority, without revealing the confidential information of his own client to the prosecutor's office, the FBI, the IRS and the press.[9]

Schafer placed himself above the code of ethics and the attorney-client privilege that has governed the legal profession for centuries. Despite the unnecessary harm caused to

---

[9] Furthermore, when Schafer disclosed Hamilton's statements to the court and other organizations, he did not seek any protection for his client's disclosures. Schafer argues that the disclosure of Hamilton's confidences, in addition to the public records, was necessary to prove that he had "righteous motives." Resp't Lawyer's Opening Br. at 23-24. If disclosure of Hamilton's confidences were necessary to complete an investigation of Anderson, however, Schafer could have indicated that he possessed sensitive client information that he would reveal if adequate safeguards were in place.

his client, Schafer stated at oral argument: "I feel no contrition. I don't feel that what I did was wrong in the slightest, I really don't." *In re Disciplinary Proceeding Against Schafer*, No. 08652-4 (Oral Argument) (Wash. Supreme Ct. May 7, 2002).

### B. Judicially Created Crime-Fraud Exception

 Schafer contends that the judicially created crime-fraud exception also justifies his disclosure of Hamilton's confidences. However, that exception generally does not apply when an attorney seeks to disclose past wrongdoing. This is because the benefit of revealing a past harm that can no longer be prevented does not outweigh the injury to attorney-client relationships that would result by disclosure. *See United States v. Zolin*, 491 U.S. 554, 562-63, 109 S. Ct. 2619, 105 L. Ed. 2d 469 (1989) ("The attorney-client privilege must necessarily protect the confidences of wrong-doers, but the reason for that protection—the centrality of open client and attorney communication to the proper functioning of our adversary system of justice—'ceas[es] to operate at a certain point, namely, where the desired advice refers *not to prior wrongdoing*, but to *future wrongdoing*.'" (quoting 8 JOHN HENRY WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW § 2298, at 573 (John T. McNaughton ed., 4th rev. ed. 1961)) (citing *Clark v. United States*, 289 U.S. 1, 15, 53 S. Ct. 465, 77 L. Ed. 993 (1933))). This concept is consistent with the rejection in the RPCs of reporting past crimes. *See* RPC 1.6(b)(1) (permitting attorney to reveal confidences or secrets to prevent the client from committing a crime).

 In addition, the crime-fraud exception, as it has been used in Washington, has traditionally been applied to the evidentiary privilege available in a court proceeding, not the ethical privilege covered under the RPCs. *See, e.g.*, *Dike v. Dike*, 75 Wn.2d 1, 448 P.2d 490 (1968).[10] Thus, in the evidentiary context, a court may order that the attorney-

---

[10] We recognized in *Dike* that there are instances when society's interest in the administration of justice may outweigh the attorney-client privilege. *Dike*, 75 Wn.2d at 11. We find *Dike* is distinguishable. *Dike* involved an evidentiary privilege where the court mandated disclosure, not a voluntary disclosure from an attorney. In *Dike*, appropriate safeguards were in place whereas here, Schafer not

client privilege be breached and require disclosure of privileged material containing client confidences. *See Escalante v. Sentry Ins. Co.*, 49 Wn. App. 375, 394, 743 P.2d 832 (1987), *review denied*, 109 Wn.2d 1025 (1988). When such disclosure is required, the court can, and frequently does, ensure the placement of appropriate limitations on dissemination of the information and restrict the disclosures to only those matters necessary for the court proceeding. *Id.* The same protections are not in place with a voluntary disclosure. Washington has never applied the crime-fraud exception to client confidences such as the ones at issue here, yet Schafer invites this court to create such an exception. We decline the invitation.

C. Whistleblower Protection

▮ Schafer further argues that former RLD 12.11(b) (1992) provides comprehensive protection for anyone who reports lawyer misconduct. He relies on select language from the rule, which states, communications " 'are absolutely privileged, and no lawsuit predicated thereon may be instituted against any grievant, witness or other person providing information.' " Resp't Lawyer's Opening Br. at 55 (quoting former RLD 12.11(b)). Schafer fails to cite the beginning of the rule, which limits the protection to "[c]ommunications to the Association, Board of Governors, Disciplinary Board, review committee, hearing officer or panel, disciplinary counsel, special district counsel, Association staff, staff and peer counselors of the Lawyers' Assistance Program, or any other individual acting under authority of these rules." Former RLD 12.11(b). This list clearly does not include newspapers or other entities independent from the disciplinary process.

▮ ▮ Schafer also relies upon RCW 2.64.080, RCW 4.24.500–.520, and *Dike* as providing whistleblower protection. Similar to former RLD 12.11, RCW 2.64.080 provides

---

only sought no protection for his client, but after he revealed Hamilton's confidences in a court filing he relied on the filing as public information and also proceeded to write about his client in newspaper articles. Thus, Hamilton's statements, shared in confidence, were only public information because Schafer had exposed them.

protection for individuals who report judicial misconduct to the CJC or its investigators. RCW 2.64.080. "This absolute privilege does not apply to statements made in any other forum." *Id.* Likewise, RCW 4.24.510 applies to good faith communications to federal, state, or local government, or select regulatory agencies. RCW 4.24.510. Therefore, these provisions would grant Schafer a limited safe harbor for some of his disclosures. However, he willfully left the shelter of these statutes.

D. Washington State and United States Constitutions

■■■ Finally, Schafer asserts that his disclosures were protected by the right-to-petition, due process clauses, and the free speech provisions of the federal and state constitutions. His arguments are inconclusive and lack support. As we have recognized, " ' "[N]aked castings into the constitutional sea are not sufficient to command judicial consideration and discussion." ' " *State v. Blilie*, 132 Wn.2d 484, 493 n.2, 939 P.2d 691 (1997) (quoting *In re Rosier*, 105 Wn.2d 606, 616, 717 P.2d 1353 (1986) (quoting *United States v. Phillips*, 433 F.2d 1364, 1366 (8th Cir. 1970))).

(3) Sanctions

■■■ This court determines disciplinary sanctions by referencing the ABA *Standards for Imposing Lawyer Sanctions* (1991) (*Standards*). *In re Disciplinary Proceeding Against Johnson*, 114 Wn.2d 737, 745, 790 P.2d 1227 (1990). The *Standards* consider the following factors when assessing an appropriate sanction: (1) the duty violated, (2) the lawyer's mental state, (3) the potential or actual injury caused by the lawyer's misconduct, and (4) the existence of aggravating or mitigating factors. STANDARDS std. 3.0.

■■■ Under Standard 4.21, suspension is generally appropriate "when a lawyer . . . knowingly reveals information relating to representation of a client not otherwise lawfully permitted to be disclosed, and this disclosure causes injury or potential injury to a client." Schafer violated a central tenet of the attorney-client relationship—protecting a client's confidential information, without good

reason. While there are valid justifications for revealing a client's confidences, these instances are rare and Schafer's unnecessary revelation of Hamilton's confidential information does not qualify for an exception.[11] The hearing officer thus correctly concluded that the standard for failure to preserve a client's confidences is applicable here. DP at 40; STANDARDS std. 4.2. Having concluded that Standard 4.2 applies here, we must assess aggravating and mitigating factors to determine the appropriate duration of the suspension.[12]

The hearing officer found only one mitigating factor: Schafer had never been previously sanctioned by the WSBA. We find a second mitigating factor applicable—that because of Schafer's actions, a corrupt judge was exposed and the public was served by the judge's removal from office.

---

[11] *See* page 162-63 *supra.*

[12] The court uses the same ABA factors. *See* STANDARDS stds. 9.1, 9.2, 9.3 (*Aggravating factors* are any considerations that may justify an increase in the degree of discipline to be imposed.). Aggravating factors include: (a) prior disciplinary offenses; (b) dishonest or selfish motive; (c) a pattern of misconduct; (d) multiple offenses; (e) bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency; (f) submission of false evidence, false statements, or other deceptive practices during the disciplinary process; (g) refusal to acknowledge wrongful nature of conduct; (h) vulnerability of victim; (i) substantial experience in the practice of law; (j) indifference to making restitution; (k) illegal conduct, including that involving the use of controlled substances. Mitigation or mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. *Mitigating factors* include: (a) absence of a prior disciplinary record; (b) absence of a dishonest or selfish motive; (c) personal or emotional problems; (d) timely good faith effort to make restitution or to rectify consequences of misconduct; (e) full and free disclosure to disciplinary board or cooperative attitude toward proceedings; (f) inexperience in the practice of law; (g) character or reputation; (h) physical disability; (i) mental disability or chemical dependency including alcoholism or drug abuse when: (1) there is medical evidence that the respondent is affected by a chemical dependency or mental disability; (2) the chemical dependency or mental disability caused the misconduct; (3) the respondent's recovery from the chemical dependency or mental disability is demonstrated by a meaningful and sustained period of successful rehabilitation; and (4) the recovery arrested the misconduct and recurrence of that misconduct is unlikely; (j) delay in disciplinary proceedings; (k) interim rehabilitation; (*l*) imposition of other penalties or sanctions; (m) remorse; (n) remoteness of prior offenses.

The hearing officer found several aggravating factors. The hearing officer found that Schafer possessed a selfish motive because he was motivated, at least in part, by a personal vindication, as illustrated by his revelation of Hamilton's confidences and secrets in his motion for discretionary review to the Court of Appeals in the *Barovic* case (a wholly unrelated matter in which he was the losing attorney) and by faxing his declaration to three newspapers. Additionally, the hearing officer found that Schafer's multiple disclosures evidenced a pattern of misconduct. Schafer could and should have sought to remove the corrupt judge without revealing his client's confidences. Because Schafer would not accept the need for appropriate steps to protect his client's confidences, the hearing officer concluded that Schafer refused to accept the wrongful nature of his conduct. Finally, the hearing officer found that Schafer's substantial experience in the practice of law, 14 years at the time of the disclosures, was an additional aggravating factor. The hearing officer concluded that these factors warranted a six-month suspension.

The disciplinary board concurred with the hearing officer's assessment of the mitigating and aggravating factors, but a majority of the board determined that the factors warranted an increase in the suspension from six months to one year. The board based this increase on Schafer's refusal to acknowledge the wrongful nature of his conduct:

> Mr. Schafer allowed his strongly held personal beliefs to interfere with his ethical duties to his former client. Our judicial system cannot allow individual lawyers to personally determine when they are morally required to disclose a client's secrets or confidences. The balancing here has been done by the Supreme Court. Any exceptions to this balancing are appropriately submitted to a court for decision. Lawyers, including Mr. Schafer must follow this judicial balancing.

DP at 12. While we cannot dispute the board's conclusion that Schafer applied a brand of situational ethics to his decisions here, we disagree with the increase in Schafer's suspension.

 "This court gives 'serious consideration' to the recommendations of the Disciplinary Board." *In re Disciplinary Proceeding Against Plumb*, 126 Wn.2d 334, 337, 892 P.2d 739 (1995). We will accept the recommendation of the disciplinary board unless we can articulate a reason for departure under one of the following five factors:

"(1) The purposes of attorney discipline (sanction must protect the public and deter other attorneys from similar misconduct);

"(2) The proportionality of the sanction to the misconduct (sanction must not depart significantly from sanctions imposed in similar cases);

"(3) The effect of the sanction on the attorney (sanction must not be clearly excessive);

"(4) The record developed by the hearing panel (sanction must be fairly supported by the record and must not be based upon considerations not supported by the record); and,

"(5) The extent of agreement among the members of the Board (sanction supported by unanimous recommendation will not be rejected in the absence of clear reasons)."

*Id.* at 338 (quoting *Johnson*, 114 Wn.2d at 752 (summarizing *In re Disciplinary Proceeding Against Noble*, 100 Wn.2d 88, 95-96, 667 P.2d 608 (1983))). Seven of the ten members of the disciplinary board concluded that the increased sanction was necessary to protect the public and deter other lawyers from similar misconduct. As noted, however, the Board was not unanimous in its recommendation.

We conclude that a one-year suspension is not necessary to protect the public from similar misconduct and that a six-month suspension will suffice.[13] While we applaud the results of Schafer's research into public records revealing Anderson's misconduct,[14] we do not condone his unnecessary revelation of client confidences in the process, in

---

[13] A six-month suspension is the minimum suspension recommended by the *Standards*. STANDARDS std. 2.3.

[14] In making his decision, the hearing officer took into account the beneficial consequences of Schafer's actions, stating:

particular his sharing of Hamilton's statements with the press, the IRS, the FBI and the prosecutor's office.

Additionally, Schafer's claims of entirely righteous motives are diluted by many of the facts. Despite being made aware of Anderson's alleged misconduct in 1992, Schafer waited over three years to investigate. He was prompted into action only when Anderson ruled against Schafer, finding his client's claims to be without legal merit and frivolous in nature. Additionally, Schafer continued to abuse his former client's trust by writing newspaper articles disclosing Hamilton's "indiscreet comment," almost two years after the investigation into Anderson had already begun.

Nevertheless, we recognize that an important purpose of attorney discipline is to maintain public confidence in the legal profession. *In re Disciplinary Proceeding Against Halverson*, 140 Wn.2d 475, 498, 998 P.2d 833 (2000); *In re Disciplinary Proceeding Against McMullen*, 127 Wn.2d 150, 163, 896 P.2d 1281 (1995). Here, Schafer's unethical conduct resulted in the removal of a corrupt judge. Harsh discipline under these circumstances would likely undermine the public's confidence in the legal profession.

Therefore, we conclude that Schafer should be disciplined for his knowing and willful misconduct, recognizing that two mitigating and several aggravating factors were present. We also agree with the hearing officer's conclusion that Hamilton's reputation was harmed, and that Hamilton incurred costs and attorney fees in defending himself, thus incurring harm.[15] DP at 41. This relatively minimal sanction acknowledges the wrongful nature of

---

Schafer should be commended for his extraordinary efforts and careful, meticulous research in the public records to "connect the dots" and "put the puzzle pieces together" to expose the "pattern of dishonest behavior" described in *In re Disciplinary Proceeding Against Anderson*, 138 Wn.2d 830, 981 P.2d 426 (1999), that resulted in Anderson's removal from judicial office and ultimately Anderson's stipulation to a two-year suspension of his license to practice law in the State of Washington.

DP at 38-39.

[15] Schafer's actions also caused harm to Hamilton by placing Hamilton at risk of prosecution, even though this did not in the end materialize.

revealing a client's confidences and serves the purposes of attorney discipline.

## III

Douglas Schafer holds himself above the code of his profession and above the law—he claims too much. Schafer asserts the right to define morality—to carve out his own exceptions to a time-honored obligation of his chosen profession. A valid directive cannot be sacrificed to aid a lawyer in his personal vendetta. Who will be safe? The client who tells too much? The client who reveals an indiscretion unrelated to the subject of the representation? The potential exposure is enormous. This is the very reason that the attorney-client privilege was created.

We hold that Schafer violated his ethical obligations as an attorney under the RPC when he unnecessarily revealed his client's confidences and secrets beyond the appropriate tribunal designated by the people of the state of Washington for receipt of such complaints. We conclude that none of Schafer's proposed exceptions to RPC 1.6 excuse him from this violation. To emphasize the importance of maintaining client confidences in an attorney-client relationship, we agree with both the hearing officer and a unanimous disciplinary board that Schafer's knowing disregard for an attorney's code of conduct warrants sanctions. We conclude that a one-year suspension in these circumstances would be excessive, however, and reduce the sanction to a six-month suspension.

IRELAND, CHAMBERS, and OWENS, JJ., and SMITH, J. PRO TEM., concur.

SEINFELD, J.* (concurring) — I concur with the majority's conclusions that (1) Schafer violated RPC 1.6 by disclosing his client's confidences; (2) there is no applicable exception

---

* Judge Karen G. Seinfeld is serving as a justice pro tempore of the Supreme Court pursuant to Const. art. IV, § 2(a).

that excuses his conduct; and (3) a six-month suspension is appropriate. I write separately solely to express my respectful disagreement with the majority's suggestion that, under the circumstances here, a favorable outcome for the public at large justified the intentional violation of client confidentiality.

Although Schafer's flagrant betrayal of his client's confidences ultimately led to the public unveiling of judicial misconduct, this fact does not make Schafer's conduct less reprehensible or less deserving of serious discipline. By suggesting that it does, we discard clear standards of professional conduct; instead, we adopt hindsight as a yardstick to measure the appropriate sanctions for the "knowing disregard for an attorney's code of conduct . . . ." Majority at 173.

Under the majority's reasoning, had Schafer's disclosures not led to Judge Anderson's removal, for any of various possible reasons, the majority's mitigating factor would not be applicable. But because the disclosures did lead to a positive outcome, the majority adopts and applies a mitigating factor. This double standard allows lawyers to gamble on a positive outcome to justify what otherwise would be clearly unacceptable conduct.

Maintaining public confidence in the legal profession is an important purpose of attorney discipline. Although maintaining client confidences promotes this purpose, there are situations where it is appropriate to mitigate the sanction for a violation. *In re Disciplinary Proceeding Against Halverson*, 140 Wn.2d 475, 498, 998 P.2d 833 (2000); *In re Disciplinary Proceeding Against Plumb*, 126 Wn.2d 334, 337, 892 P.2d 739 (1995); *In re Disciplinary Proceeding Against McMullen*, 127 Wn.2d 150, 163, 896 P.2d 1281 (1995). But when considering mitigating factors, the sanctioned attorney's motive or lack of intent to violate the rules is critical. *See* ABA STANDARDS FOR IMPOSING LAWYER SANCTIONS std. 9.3 (1991) (absence of a dishonest or selfish motive is a mitigating factor); *see also In re Disciplinary Proceeding Against Allper*, 94 Wn.2d 456, 464, 617 P.2d 982

(1980) ("the attorney's motive and purpose" is a mitigating factor).

As the majority notes, "[n]one of Schafer's excuses for his breach of Hamilton's trust are persuasive." Majority at 164. According to the disciplinary board, "it is not reasonable to believe that any of these disclosures were necessary to report suspected judicial or lawyer misconduct." Decision Papers (DP) at 554. And at least part of Schafer's motivation to disclose Hamilton's confidences was a desire for personal vindication against a judge whom Schafer believed had wronged him. DP at 41-42, 555. The fact that Schafer waited nearly three years to act supports this evaluation of his conduct.

Nor is this a situation where the negligible degree of harm to the client makes it appropriate to mitigate the sanction. *See In re Disciplinary Proceeding Against Salvesen*, 94 Wn.2d 73, 77, 614 P.2d 1264 (1980) (fact that client suffered no financial loss from attorney's misuse of client funds a mitigating factor). Schafer's client sustained humiliation and financial costs.

A premise underlying both our criminal and civil justice systems is individual responsibility. But, in law, we also temper justice with mercy, recognizing circumstances that may interfere with a tortfeasor's or criminal's exercise of individual responsibility, such as mental illness or substance abuse. Mercy is not warranted, however, where an individual intentionally or irresponsibly violates society's edicts because of a wish for personal vindication, even if the inappropriate conduct happens to lead to a favorable outcome. The Supreme Court should hold that individual responsibility is equally critical to the attorney disciplinary rules.

Here, where the record indicates that Schafer intentionally violated the Rules of Professional Conduct and the record does not show that he was unable to assume full responsibility for his actions, the court should not consider as a mitigating factor any benefit that the public enjoyed as a result of Schafer's unprofessional conduct.

WINSOR, J.[*] (concurring in part, dissenting in part) — I concur with the majority that Schafer violated RPC 1.6 as adopted in Washington when he revealed his client's confidences.[16] Until such time, if ever, as this court may elect to consider and adopt a revision to RPC 1.6, *see* n.16, *supra*, we must enforce the rule as written. We cannot excuse Schafer's violation of the rule as it is now written while expecting every other lawyer in the state to adhere to it. A sanction must be applied. I write separately because I believe a six-month suspension of Schafer's license to practice law is too harsh in the circumstances of this case.

As the majority points out

> In a bar discipline case, this court generally accepts as true any unchallenged findings of fact made by the hearing officer that are affirmed by the disciplinary board. . . . A hearing officer's conclusions of law will be upheld if they are supported by the findings of fact.

Majority at 158. *See In re Disciplinary Proceeding Against Carmick*, 146 Wn.2d 582, 594, 48 P.3d 311 (2002).

I strongly contend that the fact that Schafer's actions caused the removal of a corrupt judge from the bench is a

---

[*] Judge Robert W. Winsor is serving as a justice pro tempore of the Supreme Court pursuant to Const. art. IV, § 2(a).

[16] Washington's RPC 1.6 is based on the ABA's *Model Rules of Professional Conduct*, Rule 1.6 (1991). A recent proposed revision of the Model Rule would have permitted a lawyer to reveal information relating to the representation of a client to the extent the lawyer reasonably believes necessary in order to "prevent, mitigate or rectify substantial injury to the financial interests or property of another that is reasonably certain to result or has resulted from the client's commission of a crime or fraud in furtherance of which the client has used the lawyer's services." MODEL RULES OF PROF'L CONDUCT R. 1.6(b)(3), *reprinted in* CTR. FOR PROF'L RESPONSIBILITY, ABA ETHICS 2000 COMM'N REPORT, *available at* http://www.abanet.org/cpr/. Although the ABA's House of Delegates rejected the proposed revision in August 2001, the national debate has not ended. On August 1, 2002, the Conference of Chief Justices (a body consisting of the highest judicial officers of the 50 states, the District of Columbia, the Commonwealth of Puerto Rico, the Commonwealth of the Northern Mariana Islands, and the territories of American Samoa, Guam and the Virgin Islands) passed a resolution (Resolution 35) supporting the proposed revision. POLICY STATEMENTS AND RESOLUTIONS: RESOLUTION 35 AS ADOPTED BY THE BAR COMMITTEE OF THE CONFERENCE OF CHIEF JUSTICES, Annual Meeting (Aug. 1, 2002), *available at* http://ccj.ncsc.dni.us/. (Resolution identified as Resolution 35 In Support of Rule 1.6(b)(2) and 1.6(b)(3) of Ethics 2000 Commission.)

very substantial mitigating factor under ABA *Standards for Imposing Lawyer Sanctions* (1991 & Supp. 1992) Standard 4.2. The majority recognizes that he performed a public service and that it is a mitigating factor. But in the next paragraph it deals with "aggravating factors" and questions how large a part Schafer's selfish interest may have played in his motivation. The hearing officer made explicit findings of fact about that:

> Schafer's overriding and central purpose . . . was to expose Anderson as corrupt and to have him removed from the bench.

Answering Br. of Wash. State Bar Ass'n (app. A) at 32 (finding of fact and conclusion of law 38). The hearing officer further found, under aggravating and mitigating factors, that

> Schafer's motive was not dishonest but was partially selfish. In addition to Schafer's *primary* motive of exposing judicial corruption, Schafer was also motivated by personal vindication.

*Id.* at 41-42 (emphasis added).

The concurring opinion argues hypothetically that if Schafer's disclosures had NOT led to Judge Anderson's removal, there could not be a mitigating factor applied and argues, somehow, that a "double standard" would result. Concurrence at 174. We need not rule on that hypothetical case today. But I suggest that the issue then might be whether the lawyer had reasonable cause to believe that the judge was corrupt. If he did, it might well be considered in mitigation.

My disagreement with the majority is that it discounts too much the mitigating factor of the public good accomplished by Schafer's actions. My disagreement with the concurring opinion is that it denies to Schafer any mitigating factor at all for the public good he intended and accomplished.

A primary purpose of lawyer discipline is to maintain the integrity of the profession and the public's confidence in the

judicial system as a whole. *In re Disciplinary Proceeding Against Halverson*, 140 Wn.2d 475, 498, 998 P.2d 833 (2000). I do not believe that suspending Schafer's license to practice law for a period of six months is necessary to achieve that purpose. A more likely public reaction to such a harsh sanction in this post-Enron era is the opposite—a perception that lawyers can be counted upon not to reveal fraud perpetrated by their clients because any whistleblowers among them will be severely punished by the courts, regardless of the public good that such whistleblower might accomplish.

I believe that a suspension for 30 days would be a sufficient sanction in this case.

MADSEN, J., and KENNEDY, J. PRO TEM., concur with WINSOR, J. PRO TEM.

Reconsideration denied June 23, 2003.